UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

ZUBAIR PATEL, Individually and on Behalf :   Civil Action No. 1:14-cv-06038-VEC
of All Others Similarly Situated,               :   (Consolidated)
                                          :
                       Plaintiff,   :   <u>CLASS ACTION</u>
                                          :
       vs.                                   :
                                          :
L-3 COMMUNICATIONS HOLDINGS, INC., :
et al.,                                        :
                                          :
                       Defendants.   :   <u>DEMAND FOR JURY TRIAL</u>

———————————————————— x

## SECOND CONSOLIDATED AMENDED COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs City of Pontiac General Employees' Retirement System ("City of Pontiac"), Local 1205 Pension Plan ("Local 1205"), and City of Taylor Police and Fire Retirement System ("City of Taylor," and collectively, "Plaintiffs"), on behalf of themselves and all other persons similarly situated, by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Plaintiffs' counsel. The investigation included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by L-3 Communications Holdings, Inc. ("L-3" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by the Company, and interviews with former L-3 employees. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. This is a federal securities class action on behalf of all purchasers of the common stock of L-3 between January 30, 2014 and July 30, 2014, inclusive (the "Class Period") seeking to pursue remedies against L-3 and its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2. This case arises from a massive accounting fraud that was concealed by Defendants when brought to their attention. Defendants have now admitted that intentional misconduct and accounting errors at L-3's Aerospace Systems segment, in which contract cost overruns had been inappropriately deferred and net sales overstated, caused the Company's Class Period financial statements to be materially misstated. As a result of the intentional misconduct and accounting errors, the Company has now revised, or restated, its financial statements. Further, L-3's internal controls over financial reporting – which defendants Michael T. Strianese ("Strianese") L-3's CEO

and Ralph G. D'Ambrosio ("D'Ambrosio") L-3's CFO, personally designed and evaluated, or caused to be designed and evaluated under their supervision – were falsely certified by them as effective and containing no material weaknesses.

3.      Contrary to Strianese's and D'Ambrosio's sworn certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Company's internal controls contained the following material weaknesses: (1) the Company did not maintain an effective control environment at its Aerospace Systems segment with respect to: (a) inadequate execution of existing controls around the annual review and approval of contract (revenue arrangement) estimates; (b) not following established Company accounting policies, controls and procedures; and (c) ***intentional*** override of numerous transactional and monitoring internal controls at its Army Sustainment division; and (2) ***Company personnel did not perform reviews of certain employee concerns regarding violations of its accounting policies and internal controls over financial reporting ("ICFR") in a sufficient and effective manner***.

4.      As a result, L-3 terminated the Aerospace Systems segment CFO, the Logistics Solutions sector president, the Logistics Solutions sector general counsel, the Army Sustainment division president and the Army Sustainment division vice president of finance.[1]  Accordingly, the scienter at the highest levels of the Aerospace Systems segment is imputable to L-3.

5.      In addition, the SEC and U.S. Department of Justice ("DOJ") have initiated investigations into the wrongful conduct at L-3.

6.      Significantly, knowledge of the fraud reached L-3's corporate headquarters in December 2013, ***before the Class Period even began***.  At that time, a management-level employee within the Aerospace Systems segment, referred to herein as the "Whistleblower," alerted L-3 to the

---

[1]      L-3's Aerospace Systems segment includes its Logistics Solutions sector (which includes its Army Sustainment division) and its Platform Systems sector.

accounting fraud taking place in the Aerospace Systems segment.  However, the Whistleblower's concerns regarding violations of the Company's accounting policies and internal controls were inadequately addressed and concealed from investors, even though L-3 had previously put in place a strict self-governance program as required by an Administrative Agreement between L-3 and the U.S. Air Force due to prior L-3 employee misconduct.  Strianese was personally and directly responsible for such program, and knowingly and/or recklessly failed to adequately address the Whistleblower's concerns before or during the Class Period, and both Strianese and D'Ambrosio knowingly and/or recklessly made statements to investors regarding the Company's financial performance without disclosing or adequately addressing the concerns raised by the Whistleblower.

7.     Demonstrating Defendants' knowledge of the Whistleblower's concerns, in January 2014, before the Class Period began, and without disclosure to investors, L-3 fired the Army Sustainment division vice president of finance for intentional misconduct – a decision that, reasonably, could not have been made without L-3 senior management's knowledge.  Thus, L-3's senior management caused the Company to issue financial statements during the Class Period notwithstanding their undisclosed knowledge of intentional wrongful conduct that rendered those financial statements materially false and misleading.

8.     As a result of Defendants' wrongful acts and omissions, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

- 3 -

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the alleged misconduct was transacted in and emanated in large part from this District.

11.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.     Lead Plaintiff City of Pontiac, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased the common stock of L-3 during the Class Period, and was damaged thereby.

13.     Lead Plaintiff Local 1205, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased the common stock of L-3 during the Class Period, and was damaged thereby.

14.     Lead Plaintiff City of Taylor, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased the common stock of L-3 during the Class Period, and was damaged thereby.

15.     Defendant L-3 supplies command and control, communications, intelligence, surveillance and reconnaissance systems and products, avionics, ocean products, training devices and services, instrumentation, space, and navigation products to the United States Departments of Defense and Homeland Security, the United States government intelligence agencies, NASA, aerospace contractors and commercial telecommunications and wireless customers.  L-3 is headquartered at 600 Third Avenue, New York, New York.  As of April 23, 2014, the Company had more than 86 million shares of common stock issued and outstanding which actively traded throughout the Class Period on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "LLL."

16.     Defendant Strianese is, and was throughout the Class Period, the Chairman of L-3's Board of Directors, its CEO, President, and a member of its Executive Committee.  Strianese became CEO in October 2006.  Until February 2007, Strianese was also L-3's Corporate Ethics Officer.

17.     Defendant D'Ambrosio is, and was throughout the Class Period, L-3's Senior Vice President and CFO.  D'Ambrosio became CFO in January 2007.

18.     Defendants Strianese and D'Ambrosio are referred to herein as the "Individual Defendants."   L-3 and the Individual Defendants are referred to herein, collectively, as "Defendants."

19.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including information relating to the Company's whistleblower hotline and the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

20.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the

Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.   Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

21.     As officers and controlling persons of a publicly held company whose shares were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded over the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded shares would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about L-3's business prospects and financial condition and performance as particularized herein and knew (or recklessly

disregarded) that these adverse facts rendered the positive representations made by or about the Company and its business issued or adopted by the Company materially false and misleading.

23.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of L-3 during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, L-3 common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by L-3 and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

26.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

27.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of L-3; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

30.     Defendant L-3 was founded in 1997 and built through mergers and acquisitions of smaller companies.  It supplies a wide range of military and civil electronics equipment and services, including aircraft "black boxes," communications transponders and cockpit display panels.  The

Company is one of the top ten U.S. government contractors, with two of its largest customers being the U.S. Departments of Defense and Homeland Security.

31.     L-3 operates via four reportable segments, with each segment's corresponding portion of total net sales in parentheses: (1) Aerospace Systems (36%); (2) Electronic Systems (36%); (3) Communication Systems (18%); and (4) National Security Solutions (10%).

### Prior to the Class Period, L-3 Was on Alert that It Needed to Maintain an Effective Process to Address Concerns of Whistleblowers

32.     In 2010, it was announced that L-3's Special Support Programs Division had been suspended by the United States Air Force (the "Air Force") from doing any contract work for the U.S. federal government (the "Government").  A U.S. Department of Defense investigation had reportedly found that the Company had "used a highly sensitive government computer network to collect competitive business information for its own use."  A U.S. federal criminal investigation ended the temporary suspension on July 27, 2010, when L-3 and the Air Force entered into an administrative agreement (the "Administrative Agreement") that outlined certain corrective actions that L-3 was required to undertake in order to end its suspension as a federal government contractor. The duration of the Administrative Agreement was to be three years from the date the agreement was executed.

33.     Pursuant to the Administrative Agreement, L-3 was required to maintain a self-governance program that included an Ethics and Business Conduct Program (the "Program") that covered all employees.  The Program was established to ensure that L-3 and each of its employees maintained the business honesty and integrity required of a Government contractor and that L-3 operated in strict compliance with all applicable laws, regulations, and the terms of any contract. The Administrative Agreement provided that Vice President of Internal Audit and Corporate Ethics

Officer, Fred Piccirillo (the "Ethics Officer"), was responsible for managing all aspects of the Program.

34.     The Administrative Agreement emphasized the need for whistleblowers within L-3 to convey their concerns about any improper or inappropriate conduct within L-3 regarding, among other things, contracts with the Government.  For example, the Administrative Agreement mandated L-3 to post notices in prominent places listing a toll-free telephone number for employees to report concerns anonymously and encouraged individuals to report issues or seek guidance on any aspect of the Company's business.  The notices also provided phone numbers to report fraud, waste, abuse, and/or security violations to the Inspector General of the Department of Defense.

35.     The Air Force saw the need for Defendant Strianese, L-3's CEO, to play an integral role in executing the Administrative Agreement.  Pursuant to the Administrative Agreement, L-3's CEO and Ethics Officer were responsible for ensuring that the Company maintained and updated a written Code of Ethics and Business Conduct (the "Code") as necessary, as well as for providing periodic audits (at least once each calendar year) of the Company's business practices, procedures, policies, and internal controls for compliance with the Administrative Agreement, the Code, and the special requirements of Government contracting, including monitoring and auditing to detect misconduct, periodic evaluation of the effectiveness of the Program and periodic assessment of the risk of misconduct, with appropriate steps to modify the Program as necessary to reduce the risk of misconduct as identified through this process.

36.     The Ethics Officer was required to report to the CEO in person and in writing not less than quarterly concerning the Company's Program and compliance with the Administrative Agreement.  The CEO was required to take whatever actions were appropriate and necessary to ensure that the Company conducted its activities in compliance with the requirements of the law and

sound business ethics.  The Company was required to provide to the Air Force copies of such written reports.

37.     Moreover, each calendar quarter, the CEO was required to submit a written report to the Air Force describing the measures taken by the Company during that quarter to ensure compliance with the Administrative Agreement.  Among other things, the written reports were required to include a separate report identifying all calls made to the L-3 internal confidential toll-free line regarding instances of suspected misconduct brought to the attention of management through any other channel during the preceding quarter.  Such reports required detailed information, including summaries of the facts of each matter, stating the date and source, medium of the report, the date and nature of the reported conduct, type and results of any internal investigation, corrective and/or disciplinary action and date of feedback to the source of the information.  If the Company had received no reports, L-3 was required to report that fact as well.

38.     As a result of L-3's entry into the Administrative Agreement, Defendants were on alert that they needed to maintain adequate internal controls to root out employee misconduct, including through an effective process to address concerns of whistleblowers.  However, by their own admission, Defendants' Class-Period procedures relating to the review of employee concerns failed.

### L-3's Army C-12 Contract

39.     As part of their investigation into the facts underlying this action, counsel for Plaintiffs interviewed former employees of L-3 who had extensive knowledge of, and experience with, the contract at the heart of the misconduct alleged herein.

40.     As Defendants admitted at the end of the Class Period, the misconduct primarily related to: (1) contract cost overruns that were inappropriately deferred; and (2) overstatements of net sales, both with respect to a fixed-price maintenance and logistics support contract, *i.e.*, L-3's

contract to maintain U.S. Army C-12 airplanes. ***These former employees provided information that illustrates the misconduct in connection with the C-12 contract that was admitted by Defendants after the Class Period.***

41.     Former Employee No. 1 ("FE1") worked within L-3's Aerospace Systems segment in the Army Sustainment division ("ASD") as a member of the Army Support section in Huntsville, Alabama.

42.     FE1 served as the Aircraft Engine Manager from March 3, 2013 to March 10, 2014. He served as the Ground Support Equipment Manager from March 10, 2014 through October 31, 2014.  As part of his job responsibilities, FE1 prepared monthly forecasts of the number of engine overhauls required to be performed by L-3 pursuant to L-3's contract to maintain U.S. Army C-12 airplanes.  According to FE1, the Army C-12 contract is the Army's largest fixed-wing-aircraft contract.  The C-12 fixed-wing unit flies Transport, Special Equipment Mission Aircraft, and Reconnaissance missions all over the world.  L-3's C-12 contract provides maintenance for all of the U.S. Army's fixed-wing aircraft.

43.     According to FE1, the organizational structure within the Aerospace Systems segment was as follows: the Army Support section reported to ASD; ASD reported to Aerospace Systems; and Aerospace Systems reported to the corporate office in New York, which included the CEO and CFO.

44.     Rick Schmidt was the Program Director at the time FE1 was hired, and was the senior-most executive to whom FE1 directly reported.  FE1 stated that Finance Director Kevin Nugen, Maintenance Director Brad Hall, and Logistics Director Eric Post reported to Schmidt and later Roderick Hynes.  Schmidt/Hynes reported to ASD Vice President & CFO David Pruitt, who, in

turn, reported to ASD President Mark Wentlent, who, in turn, reported to Aerospace Systems segment CFO Gordon Walsh.

45.     There were approximately five managers who reported to the aforementioned executives.  One was the Whistleblower, who ultimately blew the whistle on the intentional misconduct occurring in the Aerospace Systems segment.[2]  The Whistleblower was on the same reporting level as FE1, and they interacted with each other on a regular basis.

### Forecasts Prepared by FE1 Were Manipulated by His Superiors

46.     Part of L-3's responsibilities under the C-12 contract was to inspect the aircraft in order to properly maintain them.  According to FE1, aircraft inspections are based on hours flown.  FE1 was also responsible for forecasting the number of engine overhauls that L-3 needed to perform under the C-12 contract.

47.     FE1 compiled his monthly forecasts into a spreadsheet, which was known as a short-term integrated forecast ("STIF"), and presented the numbers to the Whistleblower.  They would then have a manager-level meeting to discuss and finalize those numbers.  After the numbers were confirmed at the manager level, the STIF report would be sent to the Program Director.  The STIF report was then sent to Pruitt and Wentlent for their approval, and then to Walsh.  FE1 explained that it was difficult to forecast the number of engine overhauls he would need to perform monthly because the Army did not strictly adhere to the maintenance schedules.

48.     FE1 stated that he attended monthly meetings comparing actual vs. forecasted numbers, which were chaired by the Whistleblower, and the actuals were always off the forecasts.

---

[2]     FE1 identified the Whistleblower by name to Plaintiffs' counsel, but Plaintiffs have not disclosed the Whistleblower's name herein.  If the Court requests, Plaintiffs are prepared to disclose the Whistleblower's name *in camera*.

According to FE1, it was at those meetings where they would get their "bludgeoning" to make their numbers.

49.     Pressure to increase the forecasted numbers was applied on FE1 directly by Wentlent, the ASD President.  For example, in October 2013, FE1 had forecasted four engine overhauls for the month on the STIF report.  He had already achieved his forecasted goal when he ran into Wentlent in the hallway.  Wentlent – whose office was three doors down from FE1 but did not know FE1's name, only referring to him as the "engine guy" – asked FE1 how he was doing.  FE1 told Wentlent that he had already achieved his forecasted goal of four engines.  According to FE1, Wentlent seemed surprised and said to FE1: "Four engines?  You mean *eight*."  (Emphasis in original.)  FE1, knowing that he only forecasted four engine overhauls, simply agreed with Wentlent.  FE1 then confronted the Whistleblower and asked him if he changed FE1's STIF numbers.  The Whistleblower told FE1 that he could not discuss it, but all FE1 had to worry about was his four engines.  FE1 assumed that the Whistleblower was simply going to fix the STIF report.

50.     According to FE1, he had a similar conversation with the Whistleblower about the STIF numbers in December 2013.  Again, the Whistleblower told FE1 not to worry and he was going to take care of it.  And again, FE1 believed that the Whistleblower was going to make sure that the correct numbers were reported in the STIF report.

51.     FE1 stated that in December 2013, it was rumored that there were serious problems, or "foul play," going on with the C-12 contract.

52.     FE1 stated that Wentlent always told him to "push the engines" and one time told him to bring in more revenue, and Wentlent did not care where the revenue came from, either the left or the right, which FE1 understood to mean that if he couldn't get revenue from engines, he should get it from "hot inspections," landing gear or props.

53. FE1 further stated that the managers at his level were always under pressure to "make their numbers." At one meeting attended by FE1, the Whistleblower, and Schmidt, the Whistleblower was in the "crosshairs," and told Schmidt that the numbers could not be achieved. Schmidt told the Whistleblower to "unf*ck this," and "get us what we need." According to FE1, the Whistleblower attended a lot of meetings with the "higher-ups" where they "put the screws" to the Whistleblower. On some occasions, FE1 did not physically have the number of engines that senior management told him he needed.

54. FE1 had participated in at least four inventory audits which he considered "a waste of time" because the inventory lists did not match what the Company actually had in stock. *FE1 had seen a document that indicated that L-3's C-12 program had 100% of the required landing gear inventory in stock, including heavy gears. However, FE1 knew for a fact that the heavy gears were not in stock and they were only able to get them by turning in the old gears when buying new ones. Both Tim Oliver, who replaced FE1 as Engine Manager in March 2014, and Brad Hall told FE1 not to say otherwise to Aerospace Systems segment CFO Gordon Walsh.*

### According to Former Employees, Contract Line Item Number 9 Was Created to Defer L-3's Losses on the C-12 Contract

55. FE1 explained there were eight contract line-item numbers, or "CLINs," covering every section of the contract. He further stated that in order to account for the over-and-above charges not reimbursed by the Government, L-3 initiated CLIN Number 9 ("CLIN 9") for the C-12 contract. FE1 stated that CLIN 9 was used to account for the over-and-above charges.

56. FE1's insight into CLIN 9 is corroborated by Former Employee No. 2 ("FE2"), who immediately preceded FE1 as Engine Manager and served in that capacity from the outset of the C-12 contract.

57.     FE2 worked as the Aircraft Engine Manager in Huntsville, Alabama from October 2010 through January 2013, when he was promoted to Aircraft Maintenance Manager/Assistant Director of Maintenance.  FE2 held that position until July 2013.  As an Aircraft Maintenance Manager, FE2 managed the maintenance for approximately 200 Army C-12/RC-12/UC-25 aircraft, and controlled the daily activities of five regional managers and 480 U.S. and overseas mechanics located in 84 different regions of the world.  As an Aircraft Engine Manager, FE2 managed repairs, overhauls and inspections of those airplane engines.  He also oversaw the L-3 subcontractors who overhauled the airplane engines.

58.     FE2 said that he was hired in October of 2010 to work on the new L-3 Maintenance and Logistics contract for the C-12 aircraft with the U.S. Army in Huntsville.  He said the contract started at the end of 2010 and was to run until January 2015.  FE2 explained that the contract was broken up in two parts.  The Maintenance & Logistics portion was a "firm-fixed price" contract that was only billable to the Government at a firm-fixed price, meaning that L-3 had to cover all the costs associated with that portion of the contract.  On the other hand, the second portion, which he termed, "over and above with cost reimbursement," was billable to the Government as needed.  FE2 further explained that the contract allowed for over-and-above costs related to aircraft repair parts "outside of routine repair and maintenance."   These costs were submitted to the Government for reimbursement, and, thus, were a profit center for the Company.

59.     FE2 knew and worked with ASD vice president and CFO David Pruitt.  FE2 explained how Pruitt started working on the C-12 contract.  According to FE2, from early on, L-3 was suffering from cost overruns, which the Government later refused to pay for.  As a result, L-3 assembled what the Company called a "Red Team," a team of experts to come in and figure out how to effectively service the contract.  The Red Team was assembled from L-3 employees from other

contracts and programs.  According to FE2, "They are basically coming in to audit or investigate the program or contract that is suffering or having some trouble in some areas."  FE2 stated that Pruitt was on either the third or fourth Red Team brought in by L-3 to deal with the contract problems.  FE2 stated that the Red Team prior to Pruitt's was led by Wentlent.

60.     Explaining the problem with the C-12 contract, FE2 stated: "the division of L-3 that ended up executing the contract was not the division that wrote the proposal for the contract."  According to FE2, the proposal was written to include items on the fixed-price side that were not economically viable to L-3.

61.     FE2 stated that the Government paid L-3 a firm-fixed price to overhaul C-12 aircraft engines.  L-3 subcontracted maintenance work to vendors, and the price that the Government paid to L-3 was higher than the price L-3 paid the vendor that performed the work.

62.     FE2 explained that an aircraft engine, like a car, is supposed to be inspected on a periodic basis.  For example, once an aircraft engine operates for 3,000 hours, it needs to be taken off of the aircraft wing and sent into a repair facility.  As part of that process, the vendor takes the engine, and as a part of the subcontract with L-3, their firm-fixed price is to disassemble the engine, inspect it, and provide a report that explains what is wrong with it.  According to FE2, "that's all the firm fixed price gets you."  On the other hand, "any parts that are required to be changed because they're broken, they're not operating correctly, those are your over-and-above" costs.

63.     However, problems arose with the C-12 contract because L-3 was requesting reimbursement from the Government for over-and-above costs that were considered, per the terms of the contract, firm-fixed costs.  FE2 explained that, "when the subcontractor says, I'm going to need $100,000 to make this engine whole again, L-3 says that's fine and they pass that cost onto the Government and say, we need $100,000 to make that engine whole again."  In the case of the C-12

contract, frequently the Government told L-3 that it was not going to pay for certain parts, "so we're not going to give you $100,000, we're going to give you $75,000 because the $25,000 that you are requesting in over-and-above parts, that was negotiated in your firm fixed price . . . L-3 says, well now we don't have enough money to finish the engine, we need $100,000 and the government only gave us $75,[000], so now you have a cost overrun."

64.     According to FE2, "when you do that . . . you're doing roughly 50 engines a year, at an average price of about $250,000 to $300,000 each, when you're overrunning, that's just an overrun on your parts, and there is a separate piece on the firm-fixed price for a lease engine.

65.     FE2 explained that the engine overhaul vendor would not release an engine until it was paid.  However, L-3 was not budgeted or able to pass along the cost overruns to the Government because of the terms of the contract.  This, in turn, led to a backlog of completed engines held by the vendor.  This backlog also required L-3 to supply, at its cost, the lease engines for longer periods of time so the aircraft can continue to fly.  Asked for specific examples of which engine overhauls had cost overruns, FE2 responded, "Just about every one of them had."  FE2 explained: "it's kind of like having a rent-a-car while your car is in the shop.  [S]o your insurance company says, we'll pay for 5 days of rent-a-car while your car is being repaired, but [if] you keep it 6 months, you just overran the cost of what your insurance company is going to reimburse."

66.     Asked how the cost overruns were reported up the chain of command, FE2 said that he, as the Engine Manager, had the responsibility to verify what repairs an engine needs, and he prepared a monthly STIF report that he forwarded to the financial section in the Huntsville office.  The STIF report included the number of engines that he believed he could have completed and billed for in that month, as well as in that quarter.  He said: "based on how those engines are flowing

through the process, I'm either showing a profit or I'm showing a loss to the business manager here in Huntsville."

67.     FE2 stated that he first observed cost overruns associated with the C-12 contract "when the contract first started." He added that in the beginning of the C-12 contract, there was no CLIN 9,[3] and he would fund the non-funded over-and-above costs using a CLIN number for Site Maintenance, which at that time skewed the actual Site Maintenance cost numbers. *He further stated that he believed that CLIN 9 was created to give the appearance that the contract was making money and to defer losses*.

68.     FE1 stated that the financing associated with the C-12 program was in "serious disarray" when he first started, which caused him to work 70-90 hours per week for nine straight months. According to FE1, when he started, there were 13 completed engines sitting with the vendor because L-3 had not yet paid the invoice. He stated that Cessna Aircraft had stopped doing business with L-3 three times in 2014 because L-3 was not paying their invoices associated with the C-12 contract. When FE1 first started working for L-3, the C-12 contract was in the "Red" status. Towards the end of his employment, the contract was upgraded to "Yellow." FE1 explained that it was a common practice among many Government contractors to color-code the status of their contracts: Red, Yellow or Green. FE2 explained that "Red" means the contract is losing money; "Yellow" means some areas of the contract have difficulties that can be worked on; and "Green" means the contract is bringing in revenue and doing well.

69.     FE1 recalled putting at least $250,000 through CLIN 9. He stated that there were parts and services billed for as over-and-above that the Government had already argued were

---

[3]     FE2 added that the Work Break Down Structure laid out all the work to be done in the contract and which CLIN was going to fund the costs. Invoices from the vendors were coded at the program level before they were sent to L-3's Greenville, Texas office for payment.

included in the firm-fixed portion of the contract and for which the Government was not going to pay.  Thus, FE1 reiterated that many of these parts should not have been included in CLIN 9 in the first place because the contract did not provide for reimbursement for them.  At one point, all CLIN 9 costs had to be signed-off on by the Program Director or Program Manager.

70.     According to FE1, L-3 owed a vendor $3.5 million, and the Company paid for the engines to get them released.  The vendor did not care who paid it, so L-3 paid it, and, therefore, $3.5 million went into CLIN 9.  According to FE1, *CLIN 9 was needed to keep the paperwork moving*.  FE1 believed that CLIN 9 was set up by Gordon Walsh.

### L-3's Corporate Office Was Aware of Cost Overruns in the C-12 Contract

71.     FE2 stated that, early on in the contract, he participated in almost daily conference calls with personnel from the New York corporate headquarters regarding cost overruns associated with the C-12 contract.  At that time, FE2 already had approximately ten completed engines being held by the vendor because he did not have the money in the budget to pay them**.**  "The Government had funded everything that they were going to fund, and I was just waiting on the Company's decision to say, here's how we're going to move the engines, either we are going to pay for it out of L-3 funds or we are going to keep battling with the Government."  FE2 said that this happened before Wentlent and Pruitt came to Huntsville, but Walsh was involved at the time and would have been aware that Huntsville personnel were speaking directly to corporate personnel in New York.

72.     FE2 explained that his experience with conference calls with the New York corporate office regarding the financial condition/situation of the program were in the early 2011 time period.  Approximately one month after the conference calls started, FE2 was no longer asked to participate in them.  FE2 recalled a new Red Team coming every year while he was employed at L-3.

According to FE2, "***Most likely the Red Team was a product of the calls and the problems with the contract***."[4]

73.     According to FE1, in the late summer or early fall of 2013, L-3's CEO, Defendant Strianese, came to the Huntsville, Alabama office for a series of meetings that lasted two or three days.  With the possible exception of Brad Hall and the Whistleblower, Strianese only met with senior executives.[5]  FE1 was actually surprised that Strianese did not meet with the managers.  FE1 believed that Strianese would not make a site visit unless there was a real problem.

**The Whistleblower Reported the Misconduct to L-3 Corporate Headquarters**

74.     According to FE1, in either late December 2013 or early January 2014, Pruitt was demoted from Vice President to a director position, and transferred to L-3's Fort Rucker, Alabama site.  FE1 stated that, approximately 7-10 days later, Pruitt was fired.  Indeed, Pruitt's own LinkedIn page indicates that he left L-3 in January 2014.  According to FE1, after Pruitt left, it was obvious that something was going on.

75.     In February or March 2014, FE1's suspicions about his STIF numbers being manipulated were bolstered.  At that time, FE1 started hearing rumors that somebody had intentionally changed his STIF numbers and that other financial problems were discovered.  He also heard rumors that the Whistleblower had blown the whistle about the improprieties FE1 witnessed.  In February or March 2014, FE1 had a private conversation with the Whistleblower regarding the rumors, and told the Whistleblower that he heard the Whistleblower was the one who blew the whistle.  During this conversation, the Whistleblower confirmed that he had blown the whistle to

---

[4]     All emphasis is added unless otherwise noted.

[5]     Hall and the Whistleblower were wearing suits on one of the days Strianese was in Huntsville.  Because it was uncommon for Hall or the Whistleblower to wear business suits to work, FE1 believed it was possible they attended one of the meetings with Strianese.

L-3's corporate headquarters in New York via telephone.  During this conversation, FE1 told the Whistleblower that he did the right thing and that FE1 himself would have eventually reported the problems.  The Whistleblower told FE1 that he was the first person to acknowledge that the Whistleblower did the right thing.

76.     Based on his conversations with the Whistleblower in December 2013 and February/March 2014, as well as the timing of Pruitt's demotion and subsequent termination in December 2013 and January 2014, respectively, FE1 believes that the Whistleblower first reported all of the negative and money-losing issues associated with the C-12 contract to L-3's corporate office in New York in December 2013.

77.     FE1 stated that the Whistleblower flew to New York in March or April 2014 to meet with the Company's senior executives.  According to FE1, the Whistleblower was recently promoted.

78.     According to FE1, the following L-3 employees were fired as a result of the Whistleblower's statements: Gordon Walsh, Mark Wentlent, and David Pruitt.  According to FE2, Logistics Solutions sector general counsel Steve Sinquefield was also fired.

## THE TRUTH EMERGES

79.     The Whistleblower's concerns with the C-12 contract, which the Company described as "misconduct," were finally revealed on July 31, 2014.  Before the opening of trading on that day, L-3 issued a press release (the "July 2014 press release") announcing its second quarter 2014 financial results that it said were "preliminary because the Company is currently conducting an internal review that could result in increases to the preliminary adjustments included in this release."  The July 2014 press release further stated, in pertinent part, as follows:

> The review relates to accounting matters at the Company's Aerospace Systems segment, and is being conducted with the assistance of outside accounting and legal advisors.  ***The Company currently expects to incur an aggregate pre-tax charge of***

*$84 million against operating income and a related reduction in net sales of approximately $43 million. Of these charges, approximately $50 million relates to periods prior to 2014, and approximately $34 million relates to the first half of 2014, of which $30 million relates to the second quarter of 2014. Additionally, as a result of the review, the Company has lowered its estimated operating income for the Aerospace Systems segment by approximately $35 million for the second half of 2014.*

*The adjustments primarily relate to contract cost overruns that were inappropriately deferred and overstatements of net sales, in each case with respect to a fixed-price maintenance and logistics support contract.* The period of performance on this contract began December 1, 2010, and is scheduled to end on January 31, 2015. The Company believes that the amounts associated with these adjustments are the result of misconduct and accounting errors at the Aerospace Systems segment. The misconduct included concealment from L-3's Corporate staff and external auditors.

\*        \*        \*

*"We are extremely disappointed that our established policies, code of ethical conduct and controls were violated in this instance[,]"* said Michael T. Strianese, chairman, president and chief executive officer.

80.     During a call held that day with analysts and investors, Defendant Strianese discussed details of L-3's internal review, including the termination of four employees as a result of the misconduct. Strianese stated, in pertinent part, as follows:

*Through our internal processes we became aware of the misconduct. We initiated a review and identified overstatements of net sales and contract cost overruns that were inappropriately deferred. The misconduct included concealment from L-3's corporate staff and external auditors. As part of our review, we are examining the financial records of the entire Aerospace Systems segment.*

*The adjustments arising from the review include a charge of $34 million related to the first half of 2014, of which $30 million relates to the second quarter.* We are extremely disappointed by this matter.

While the review remains ongoing, *we have taken remedial actions including the termination of four employees. A fifth employee has resigned.* Based on the ongoing review and the findings, we will take additional remedial actions as necessary. . . .

It is worth reiterating that based on what we know at this time, these accounting issues are primarily limited to one business unit in the Aerospace Systems segment.

We have no reason to believe that this issue occurred at any other segments of the Company.

81.     Defendant D'Ambrosio quantified the details concerning L-3's internal review and its impact on the Company's financial results, including preliminary pretax charges against operating income totaling $84 million.  D'Ambrosio stated, in pertinent part, as follows:

> As Mike mentioned earlier, we are conducting an internal review relating to misconduct and related accounting matters at the Aerospace Systems segment.  They primarily relate to one contract in the segment's logistics solutions sector for which sales and profit were overstated and cost overruns were inappropriately deferred.
>
> *                *                *
>
> **Based on the findings and the results of the internal review to date, we recorded preliminary pretax charges against operating income totaling $84 million.  Those charges pertain to periods from 2011 through the first half of 2014**.  Specifically, $30 million is for the second quarter of 2014 and $34 million is for the first half of 2014.
>
> For 2013 the charge is $34 million, $13 million for 2012, and $3 million for 2011.  Additionally, with respect to 2013, $5 million of charges affected the second quarter and $11 million affected the first half.  We also recorded preliminary adjustments to reduce sales by $43 million in the aggregate with $15 million for the second quarter of 2014, $17 million for the first half of 2014, $25 million for 2013, and $1 million for 2011.
>
> **We are reporting these financial statement adjustments that pertain to periods before the second quarter of 2014 by revising our previously issued financial statements for those periods**.  Our 2014 second-quarter preliminary earnings release includes tables that provides additional details for these financial statement revisions.
>
> As I said a few moments ago, the adjustments primarily pertain to one fixed-price maintenance and logistics support contract for the US Department of Defense.  We began working on that contract on December 1, 2010, and our period of performance ends on January 31, 2015.  That contract has averaged annual sales of approximately $150 million.  It has been a low-margin contract and, with these adjustments, it is now in a loss position.
>
> *                *                *
>
> **Getting back to this internal review at Aerospace Systems segment, I must tell you that we are terribly disappointed by the misconduct at that segment and I am outraged by it.  There is nothing more important to me than the integrity of our financial statements.  They are the absolute bedrock and we are taking all the necessary remedial actions.**

- 24 -

82.     During the call, a JPMorgan analyst suspected that the negative free cash flow experienced by L-3 during the first quarter of 2014 (described below in ¶109) was actually a red flag of misconduct occurring in the C-12 contract.  The following exchange took place:

**Joe Nadol - JPMorgan - Analyst**

[T]hen on the free cash flow front, *in Q1 we talked about on the call that it was the first time in 15 years that you had had a negative free cash flow result for the Company.  And, Ralph, I think you mentioned that Aerospace was where the greatest source of weakness was*.

*In retrospect, was this a red flag?  And if the answer is yes in retrospect, why didn't your systems pick it up at that time*?

**Ralph D'Ambrosio - L-3 Communications Holdings, Inc. - SVP & CFO**

I would say it wasn't a red flag.

**Joe Nadol - JPMorgan - Analyst**

Okay, and can you say why?

**Ralph D'Ambrosio - L-3 Communications Holdings, Inc. - SVP & CFO**

I'm saying that based upon the trending in our working capital levels that we look at each of our divisions and sectors as well as segment level.  We look at multiyear trends, so --.

**Joe Nadol - JPMorgan - Analyst**

Okay.  *What I'm getting at was this contract responsible in significant part for the lower-than-usual cash flow in the first quarter*?

**Ralph D'Ambrosio - L-3 Communications Holdings, Inc. - SVP & CFO**

No.  *It was an element of it, but it was a small portion of it*.

83.     As disclosed by *Reuters* that evening, the announcement had come about as the result of an "employee complaint" and had already resulted in four employees being fired and one more resigning.  The same day, *The Wall Street Journal* also reported that L-3 had "learned from a whistleblower that a group of former employees misstated revenue and costs linked to a U.S. Army contract."  L-3 did not disclose that day when the whistleblower came forward, but the Company had

already hired the law firm Simpson Thacher to conduct an investigation, and consulting firm AlixPartners to perform forensic accounting.

84.     *Reuters* further disclosed that "[t]he pretax charge include[d] adjustments for accounting errors L-3 found as it scrubbed its books during the review," citing confidential sources, who spoke on condition that they not be named.  *Reuters* continued, stating that, ***"[t]he profit L-3 expected in the contract just wasn't there,"*** citing "one of the sources."

85.     As *Reuters* emphasized in its report:

> L-3's shares plunged as much as 17 percent - their biggest intraday percentage drop ever - after the company said on Thursday it would take a pretax charge of $84 million for misconduct and accounting errors, including cost overruns and overstated sales figures from 2013 and 2014.
>
> ***The surprise announcement prompted some analysts to cut ratings on the company, and raised concern about a broader problem at L-3, which also suffered an ethics scandal in 2010***.

86.     On this news the price of L-3's stock plummeted to close at $103.83 per share, down approximately $15, or 12%, from its close the prior day, on very unusually high trading volume of more than 5.4 million shares trading.

87.     On September 26, 2014, L-3 issued a press release (the "September 26 press release") updating the market on the status of its internal review of the Aerospace Systems segment.  The press release confirmed analysts' fears, expressed on the July 31 conference call, that the internal review would reveal financial misstatements in more than just the Logistics Solutions sector of the Aerospace Systems segment.  Indeed, Defendants' internal review revealed that internal review adjustments for accounting misstatements impacted the Platform Systems sector as well.  L-3 stated, in pertinent part, as follows:

> The Company continues to expect to revise its previously issued financial statements for the years ended December 31, 2013, 2012 and 2011 and the three months ended March 28, 2014, which will, along with the financial statements for the three and six months ended June 27, 2014, include the internal review adjustments in the

appropriate periods. . . . *Consequently, the Company currently expects to incur pre-tax income charges of approximately: (i) $51 million of a reduction to operating income for the three months ended June 27, 2014 for the internal review, including a reduction in net sales of $3 million, (ii) $12 million of a reduction to operating income for the three months ended March 28, 2014 for the internal review, including a reduction in net sales of $2 million, and (iii) $73 million of a reduction to pre-tax income for periods prior to 2014, comprised of $101 million of reductions to operating income for the internal review, including a reduction in net sales of $48 million, offset by $28 million primarily for interest income related to the sales-type lease transaction.*

*The internal review adjustments impact the Logistics Solutions and Platform Systems sectors of the Aerospace Systems segment.  The aggregate adjustments attributable to the Logistics Solutions sector are approximately $117 million due to: (i) losses of $69 million, including inappropriately deferred cost overruns and $32 million of overstated net sales on the U.S. Army C-12 aircraft fixed-price maintenance and logistics support contract at the Army Sustainment division, and (ii) accounting errors of $48 million, including $5 million of overstated net sales, in connection with the valuation of inventories and unbilled contract receivables on other logistics support contracts.  The aggregate adjustments attributable to the Platform Systems sector are approximately $47 million, including overstated net sales of $16 million, primarily due to (i) losses on two aircraft modification contracts and two contracts for rotary wing sub-assemblies and parts, and (ii) write-offs of pre-contract costs to design, test and supply aerostructures for a new commercial aircraft*.

88.     In the September 26 press release, Defendants also revealed that the Company identified certain material weaknesses in its internal control over financial reporting that existed as of December 31, 2013 and March 28, 2014, relating to the findings from the ongoing internal review of the Aerospace Systems segment.  Defendants stated, in pertinent part, as follows:

On February 25, 2014, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2013 (the "10-K") and concluded that, as of December 31, 2013, its disclosure controls and procedures ("DC&P") were effective at a reasonable assurance level.  In addition, the Company disclosed in the 10-K its conclusion that its internal controls over financial reporting ("ICFR") were effective.  On May 1, 2014, when our Quarterly Report on Form 10-Q for the quarter ended March 28, 2014 was filed, the Company's management also concluded that its DC&P were effective at a reasonable assurance level at March 28, 2014. *Subsequent to the filing of our Quarterly Report on Form 10-Q for the quarter ended March 28, 2014, the Company identified certain material weaknesses in its internal control over financial reporting that existed as of December 31, 2013 and March 28, 2014, relating to the findings from the ongoing internal review of the Aerospace Systems segment*.  Solely as a result of these material weaknesses, the Company has

- 27 -

concluded that its DC&P were not effective as of December 31, 2013 and March 28, 2014, and that its ICFR were not effective as of December 31, 2013. Accordingly, in addition to the revisions of financial statements (discussed above), the Company will amend its Annual Report on Form 10-K for the year ended December 31, 2013, and its Quarterly Report on Form 10-Q for the quarter ended March 28, 2014, to revise its conclusions and disclose that ***management's current conclusion is that the Company's ICFR was not effective as of December 31, 2013, and its DC&P was not effective at December 31, 2013 and March 28, 2014***.

89.     Among the material weaknesses in the Company's internal controls over financial reporting, Defendants admitted that "procedures relating to the review of employee concerns regarding violations of the Company's accounting policies and internal controls over financial reporting by Aerospace Systems segment management were not executed in a manner that effectively resolved such concerns on a timely basis." Thus, Defendants tacitly admitted to their failure to properly respond to the Whistleblower's complaint, ***which predated the Class Period***. Defendants stated, in pertinent part, as follows:

> ***The Company's management has currently identified the following material weaknesses in its ICFR.***
>
> 1.     ***The Aerospace Systems segment failed to maintain an effective control environment, including (i) inadequate execution of existing controls around the annual review and approval of contract (revenue arrangement) estimates, and (ii) not following established policies and procedures and intentional override of numerous transactional and monitoring internal controls related to its Army Sustainment division***.
>
> 2.     ***The Company's procedures relating to the review of employee concerns regarding violations of the Company's accounting policies and internal controls over financial reporting by Aerospace Systems segment management were not executed in a manner that effectively resolved such concerns on a timely basis***.
>
> The Company is strengthening its control environment and organizational structure by taking the following actions:
>
> •     The Company has replaced four members of senior management at the Company's Aerospace Systems segment, Logistics Solutions sector and Army Sustainment division, including the replacement of the Aerospace Systems segment chief financial officer, the Logistics Solutions sector

president, and the Army Sustainment division president and vice president of finance. . . .

The Company also currently anticipates further improving its policies and procedures by:

- [s]trengthening our policies and procedures for the review of employee concerns regarding violations of the Company's accounting policies and ICFR, financial statement disclosures, and other accounting or financial reporting, internal controls or auditing matters to ensure effective resolution and timely communication to appropriate senior management personnel and the Company's audit committee.

90.     On October 10, 2014, L-3 issued a press release announcing the completion of its internal review of the Aerospace System segment and disclosing the extent to which the intentional misconduct and materially weak internal controls harmed the Company. L-3 stated, in pertinent part, as follows:

> ***The Company recorded aggregate pre-tax income charges related to the Internal Review of approximately $169 million, including a reduction in net sales of $58 million. The periods impacted are as follows: (i) $55 million for the three months ended June 27, 2014, including a reduction in net sales of $7 million, (ii) $20 million for the three months ended March 28, 2014, including a reduction in net sales of $8 million, and (iii) $94 million for periods prior to 2014, including a reduction in net sales of $43 million.*** The adjustments related to the Internal Review only affected the Logistics Solutions and Platform Systems sectors of the Aerospace Systems segment. The Internal Review adjustments attributable to the Logistics Solutions sector are approximately $117 million, including overstated net sales of $37 million, due to: (i) losses of $69 million, including inappropriately deferred cost overruns and $32 million of overstated net sales on a fixed-price Army maintenance and logistics support contract, and (ii) accounting errors of $48 million, including $5 million of overstated net sales, in connection with the valuation of inventories and unbilled contract receivables on other logistics support contracts. The Internal Review adjustments attributable to the Platform Systems sector are approximately $52 million, including overstated net sales of $21 million, primarily due to (i) losses of $37 million on two aircraft modification contracts and two contracts for rotary wing sub-assemblies and parts, and (ii) write-offs of deferred costs of $15 million to design and test aerostructures for a new commercial aircraft[.]

91.     The same day, L-3 issued an annual report on Form 10-K/A for the year ending December 31, 2013 (the "Amended 10-K"), which amended its previously filed Form 10-K for that time period. Also on that day, L-3 issued quarterly reports on Form 10-Q/A for the quarter ending

March 28, 2014 and Form 10-Q for the quarter ending June 27, 2014.  These reports reiterated the findings that were disclosed in the press release issued earlier that day, including the Company's findings as to materially weak internal controls and instances of deliberate misconduct and accounting errors.

92.     The Form 10-Q for the period ending June 27, 2014 (filed on October 10, 2014) disclosed that L-3 had received subpoenas for documents and other materials from the SEC and DOJ concerning its internal review related to the misconduct and accounting errors identified by the Company at its Aerospace Systems segment.

93.     On October 30, 2014, L-3 announced its financial results for the third quarter of 2014 and noted that the internal review of its Aerospace Systems segment had cost the Company $24 million in outside accounting and legal advisory costs.

94.     The same day, Defendants held a conference call with investors and analysts to discuss the Company's financial results.  Defendants' earnings presentation included the following summary of the internal review's pretax income charges:

**Internal Review Pretax Charges**
**Reconciliation from Preliminary July 31st to Final October 10th**
**($ in Millions)**

| | |
|---|---|
| **Preliminary July 31st** | **$84** |
| Logistics Solutions: | |
| - Excess Spare parts inventory Net Realized Value (NRV) | 20 |
| - Unbilled receivables and inventory NRV | 16 |
| - Other | 5 |
| | |
| Platform Systems: | |
| - Losses on an international aircraft modification contract | 14 |
| - Losses on two contracts for rotary wing subassemblies and parts | 15 |
| - Write off of deferred cost for aerostructures design and testing for a new commercial aircraft | 15 |
| | |
| **Final October 10th** | **$169** |

**Internal Review Pretax Charges by Period**
**($ in Millions)**

|  | Before 2011 | 2011 | 2012 | 2013 | 1Q14 | 2Q14 | Total |
|---|---|---|---|---|---|---|---|
| Army C-12 | $    - | $    (3) | $    (16) | $    (35) | $    (4) | $    (11) | $    (69) |
| Other | (4) | (2) | (11) | (11) | (5) | (15) | (48) |
| Logistics Solutions | $    (4) | $    (5) | $    (27) | $    (46) | $    (9) | $    (26) | $    (117) |
| Platform Systems | $    - | $    - | $    2 | $    (14) | $    (11) | $    (29) | $    (52) |
| Total | $    (4) | $    (5) | $    (25) | $    (60) | $    (20) | $    (55) | $    (169) |

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

### Statement 1: 4Q13 & Fiscal Year 2013 Press Release

95.     The Class Period starts on January 30, 2014.  On that day, L-3 issued a press release announcing its fourth quarter and fiscal 2013 financial results for the period ended December 31, 2013.  The Company reported net income of $196 million on net sales of $3.256 billion in the fourth quarter, and net income of $778 million on $12.629 billion in sales in fiscal year 2013.

96.     On this news, the price of L-3's common stock rose more than $7 per share over the next two days, from its close of $103.72 on January 29 to close at $111.07 on January 31.

### Falsity of Statement 1

97.     The statements referenced above in ¶95 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because, as Defendants themselves admitted at the end of the Class Period:

(a)     cost overruns on a fixed-price maintenance and logistics support contract were inappropriately deferred, resulting in an overstatement of the Company's operating income for 2013 of $60 million; and

(b)     the Company's net sales with respect to the fixed-price maintenance and logistics support contract were overstated.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statement 1**

98.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶95:

(a)     The Whistleblower reported his concerns to L-3 senior management before the Class Period even began.  In or about December 2013, the Whistleblower blew the whistle about intentional misconduct in the Aerospace Systems segment to L-3's corporate office, including L-3 senior management, as evidenced by the termination in January 2014 of ASD vice president David Pruitt;

(b)     Prior to the Class Period, Defendants were on alert that they needed to maintain an effective process to address concerns of whistleblowers and root out employee misconduct.  The Administrative Agreement entered into between the Air Force and L-3 prior to the Class Period (which was prompted by L-3 employee misconduct) required L-3's CEO to submit a written quarterly report to the Air Force identifying all calls made to the L-3 internal confidential toll-free line regarding instances of suspected misconduct brought to the attention of management during the preceding quarter.  The CEO's reports were required to include detailed information of the facts of each matter and the results of any internal investigation.  *See* ¶37;

(c)     Senior management of the Aerospace Systems segment committed intentional misconduct.  L-3 admitted to intentional misconduct by at least four members of the senior management of its Aerospace Systems segment, all of whom were fired by L-3.  Their scienter is imputed to L-3;

(d)     Government investigations of the wrongful conduct at the Company are ongoing.  The SEC and DOJ have initiated investigations into the wrongful conduct at L-3; and

(e)     The Company committed significant violations of Generally Accepted Accounting Principles ("GAAP").   When significant GAAP violations are described with particularity, *see* ¶¶115-156, they provide powerful indirect evidence of scienter.

## Statement 2: Fiscal Year 2013 Form 10-K

99.     On February 25, 2014, the Company filed its annual financial report on Form 10-K with the SEC, which was signed by the Individual Defendants.  The Form 10-K provided financial results similar to those provided above at ¶95 and also reiterated L-3's previously reported financial reports for the fiscal years ended December 31, 2010, 2011 and 2012.

100.     Concerning the Company's "Controls and Procedures," the Form 10-K stated, in pertinent part, as follows:

***Conclusions Regarding Effectiveness of Disclosure Controls and Procedures*** (Emphasis in the original.)

[O]ur management, with the participation of our Chairman, President and Chief Executive Officer, and our Senior Vice President and Chief Financial Officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2013. ***Based upon that evaluation, our Chairman, President and Chief Executive Officer, and our Senior Vice President and Chief Financial Officer concluded that, as of December 31, 2013, the design and operation of our disclosure controls and procedures were effective to accomplish their objectives at the reasonable assurance level***.

\*   \*   \*

***Management's Report on Internal Control Over Financial Reporting*** (Emphasis in the original.)

As required by the SEC's rules and regulations for the implementation of Section 404 of the Sarbanes-Oxley Act, our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our consolidated financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States of America. Our internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of L-3, (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors, and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the consolidated financial statements.

\*   \*   \*

***Management assessed the effectiveness of L-3 Holdings' and L-3 Communications' internal control over financial reporting as of December 31, 2013***. In making these assessments, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (1992). ***Based on our assessments and those criteria, management determined that L-3 Holdings and L-3 Communications maintained effective internal control over financial reporting as of December 31, 2013***.

101.     In addition, the Form 10-K contained certifications signed by Defendants Strianese and D'Ambrosio pursuant to §302 of SOX, representing that the financial information contained in the report was true, that it did not omit material facts, and that the Company's disclosures on internal controls and procedures were adequate.  Each certification stated, in pertinent part, as follows:

1.     I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2013 of L-3 Communications Holdings, Inc. and L-3 Communications Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d—15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the most recent fiscal quarter

that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

102.      The Form 10-K also contained certifications signed by Defendants Strianese and D'Ambrosio pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of SOX.  Each certification stated, in pertinent part, as follows:

(1)  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**Falsity of Statement 2**

103.      The statements referenced above in ¶¶99-102 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because, as Defendants themselves admitted at the end of the Class Period:

(a)      cost overruns on a fixed-price maintenance and logistics support contract were inappropriately deferred, resulting in an overstatement of the Company's operating income for 2013 of $60 million;

(b)      the Company's net sales with respect to the fixed-price maintenance and logistics support contract were overstated;

(c)      the Company's financial statements, and other financial information included in the Form 10-K, did not fairly present in all material respects the financial condition and results of operations of the Company as of, and for, the periods presented in the Form 10-K;

- 35 -

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-K their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-K did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)     the Company's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶115-156; and

(j)     the Company's internal controls were materially deficient, as detailed in ¶¶88-89.

### Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statement 2

104.    The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶99-102:

(a)     The Whistleblower reported his concerns to L-3 senior management before the Class Period even began.  In or about December 2013, the Whistleblower blew the whistle about intentional misconduct in the Aerospace Systems segment to L-3's corporate office, including L-3 senior management, as evidenced by the termination in January 2014 of ASD vice president David Pruitt;

(b)     Prior to the Class Period, Defendants were on alert that they needed to maintain an effective process to address concerns of whistleblowers and root out employee misconduct.  The Administrative Agreement entered into between the Air Force and L-3 prior to the Class Period (which was prompted by L-3 employee misconduct) required L-3's CEO to submit a written quarterly report to the Air Force identifying all calls made to the L-3 internal confidential toll-free line regarding instances of suspected misconduct brought to the attention of management during the preceding quarter.  The CEO's reports were required to include detailed information of the facts of each matter and the results of any internal investigation.  *See* ¶37;

(c)    The Individual Defendants failed to check information they had a duty to monitor.

(i)    The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)    The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)    The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining the Company's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)    As evidenced by the Company's own admissions, the Company did not maintain effective internal controls.

(d)    Senior management of the Aerospace Systems segment committed intentional misconduct.    L-3 admitted to intentional misconduct by at least four members of the senior management of its Aerospace Systems segment, all of whom were fired by L-3. Their scienter is imputed to L-3;

(e)    Government investigations of the wrongful conduct at the Company are ongoing.    The SEC and DOJ have initiated investigations into the wrongful conduct at L-3; and

(f)    The Company committed significant violations of GAAP.    When significant GAAP violations are described with particularity, *see* ¶¶115-156, they provide powerful indirect evidence of scienter.

## Statement 3: 1Q14 Press Release and Form 10-Q

105.    On May 1, 2014, before the market opened, L-3 issued a press release announcing its first quarter 2014 financial results for the period ended March 28, 2014.  The Company reported net income of $180 million on net sales of $2.971 billion.

106.    Later that day, the Company filed its quarterly financial report on Form 10-Q with the SEC signed by Defendant D'Ambrosio.  The Form 10-Q reiterated the financial results reported in the press release that day and stated the Individual Defendants "concluded that, as of March 28, 2014, the design and operation of our disclosure controls and procedures were effective to accomplish their objectives at the reasonable assurance level."

107.    In addition, the Form 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 3:**

108.    The statements referenced above in ¶¶105-107 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because, as Defendants themselves admitted at the end of the Class Period:

(a)    cost overruns on a fixed-price maintenance and logistics support contract were inappropriately deferred, resulting in an overstatement of the Company's operating income for 1Q14 of $20 million;

(b)    the Company's net sales with respect to the fixed-price maintenance and logistics support contract were overstated;

(c)    the Company's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition and results of operations of the Company as of, and for, the periods presented in the Form 10-Q;

(d)    the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)    the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)    the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)    the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)    the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)      the Company's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶115-156; and

(j)      the Company's internal controls were materially deficient, as detailed in ¶¶88-89.

109.    Also on May 1, 2014, during a conference call with analysts and investors, Defendant Strianese had the following exchange with an analyst concerning L-3's dramatic decrease in free cash flow, which Strianese blamed, in part, on "some collections not happening" in the Aerospace Systems segment.  However, the decrease in free cash flow was a red flag, warning Defendants that misconduct was occurring with the C-12 contract:

**Ralph D'Ambrosio - L-3 Communications Holdings Inc - SVP & CFO**

***Free cash flow was a negative $91 million, about $100 million lower than our plan, due to working capital, mostly receivables***.  We had higher-than-expected collections last December and that likely contributed to lower first-quarter collections.  In any event, we will recoup that cash flow later this year.

*        *        *

**George Shapiro - Shapiro Research - Analyst**

Yes, good morning.  Ralph, the $250 million or so increase in contracts and process -- you look at that as all receivables per your comment a few minutes ago?

**Ralph D'Ambrosio - L-3 Communications Holdings Inc - SVP & CFO**

***Receivables was a large portion of it***.  So for example our billed receivables actually increased in the first quarter, which you can see that on the cash flow table attached to the earnings release, which is unusual given the fact that we reduced our sales by 7%.  I attribute that to collection receivable timing differences, partially related to the strong collections that we had in December, and if you recall, we ended up doing about $60 million more of free cash flow last year and it was largely for collections that happened in December.

*        *        *

**Joe Nadol - JPMorgan Chase & Company - Analyst**

***Ralph, I was looking back in my model.  I was digging back to the last time you guys had a quarter that wasn't free cash flow positive.  I found it, I think.  It's Q1 of 1999, so it was 15 years ago***?

**Michael Strianese - L-3 Communications Holdings Inc - Chairman, President, & CEO**

*It's a rare occurrence.*

**Ralph D'Ambrosio - L-3 Communications Holdings Inc - SVP & CFO**

It was a definitely a first quarter.  That's for sure.

**Joe Nadol - JPMorgan Chase & Company - Analyst**

Yes, and you're probably 10 times the size that you were back then.  So are you -- do you not want to dig into the specific areas?  Is it really across the board?  Or is there a reason?

**Ralph D'Ambrosio - L-3 Communications Holdings Inc - SVP & CFO**

*It was probably around more so relative to our plan in Aerospace Systems, combination of some collections not happening, and some advances slipping out of first quarter.*

110.     On May 13, 2014, the Company filed a Current Report on Form 8-K with the SEC advising that "pursuant to L-3 Communications' existing shelf registration statement," the Company was "proposing to issue, subject to market conditions, unsecured senior notes in a registered offering under the Securities Act of 1933, as amended," and that the Company "intend[ed] to use the net proceeds from the offering to fund in its entirety the redemption (and any associated conversions) of all of L-3 Communications Holdings, Inc.'s outstanding 3.00% Convertible Contingent Debt Securities due August 1, 2035, of which L-3 Communications is a guarantor" and that "[a]ny remaining net proceeds from the offering [would] be used for general corporate purposes." On May 28, 2014, L-3 completed an underwritten public offering of $350 million aggregate principal amount of 1.50% Senior Notes due 2017 and $650 million aggregate principal amount of 3.95% Senior Notes due 2024.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statement 3**

111.    The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶105-107:

(a)    The Whistleblower reported his concerns to L-3 senior management before the Class Period even began.  In or about December 2013, the Whistleblower blew the whistle about intentional misconduct in the Aerospace Systems segment to L-3's corporate office, including L-3 senior management, as evidenced by the termination in January 2014 of ASD vice president David Pruitt;

(b)    Prior to the Class Period, Defendants were on alert that they needed to maintain an effective process to address concerns of whistleblowers and root out employee misconduct.  The Administrative Agreement entered into between the Air Force and L-3 prior to the Class Period (which was prompted by L-3 employee misconduct) required L-3's CEO to submit a written quarterly report to the Air Force identifying all calls made to the L-3 internal confidential toll-free line regarding instances of suspected misconduct brought to the attention of management during the preceding quarter.  The CEO's reports were required to include detailed information of the facts of each matter and the results of any internal investigation.  *See* ¶37;

(c)    The Individual Defendants failed to check information they had a duty to monitor.

(i)    The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)    The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)    The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining the Company's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)    As evidenced by the Company's own admissions, the Company did not maintain effective internal controls.

(d)    Senior management of the Aerospace Systems segment committed intentional misconduct.  L-3 admitted to intentional misconduct by at least four members of the senior management of its Aerospace Systems segment, all of whom were fired by L-3.  Their scienter is imputed to L-3;

(e)    Government investigations of the wrongful conduct at the Company are ongoing.  The SEC and DOJ have initiated investigations into the wrongful conduct at L-3;

- 41 -

(f)     The Company committed significant violations of GAAP. When significant GAAP violations are described with particularity, *see* ¶¶115-156, they provide powerful indirect evidence of scienter;

(g)     Negative free cash flow was a red flag.   The negative free cash flow experienced by L-3 during the first quarter of 2014, *see* ¶109, was a red flag of misconduct occurring in the C-12 contract; and

(h)     Defendants were motivated to perpetuate the fraud in order to complete two debt offerings during the Class Period.  In March or April 2014, the Whistleblower traveled to L-3's corporate office for a face-to-face meeting to discuss the misconduct he witnessed.  However, Defendants failed to disclose the misconduct in any of the debt offering documents issued by the Company in May 2014.

112.    The market for L-3 common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions as set forth above, L-3 common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired L-3 common stock relying upon the integrity of the market price of L-3 common stock and market information relating to L-3, and have been damaged thereby.

113.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of L-3 common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

114.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about L-3's business, prospects, and operations.  These material misstatements and

omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of L-3 and its business, prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing L-3 common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of L-3 common stock was removed and the price of L-3 common stock declined dramatically, causing losses to Plaintiffs and the other members of the Class.

### L-3'S FINANCIAL REPORTING DURING THE CLASS PERIOD WAS MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

115.    At all relevant times during the Class Period, L-3 represented that its financial results were reported in accordance with GAAP.[6]  Pursuant to Regulation S-X [17 C.F.R. §210.4-01.(a)(1)], financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.   Additionally, Regulation S-X requires that interim financial statements filed with the SEC comply with GAAP.  17 C.F.R. 210.10-01.

116.    As detailed herein, L-3 has now admitted that its financial reporting was materially misstated and violated numerous provisions of GAAP prior to and during the Class Period.

### L-3's Admissions that Its Financial Reporting During the Class Period Was Materially False and Misleading

117.    On July 31, 2014, before the market opened, L-3 filed with the SEC a Form 8-K that included, as an exhibit thereto, the July 2014 press release announcing the preliminary financial results for its 2014 second quarter, the period ended June 30, 2014.  The July 2014 press release

---

[6]     The Financial Accounting Standards Board's Accounting Standards Codification ("ASC") is the authoritative source of GAAP.  Rules and interpretive releases of the SEC under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants.

disclosed that the Company, with the assistance of outside accounting and legal advisors, was then conducting a review of certain accounting matters within its Aerospace Systems segment. These matters were the result of "misconduct" and accounting errors that caused the Company to improperly overstate its reported sales and understate its reported expenses during the Class Period.

118.    On this news, the price of L-3's common stock declined more than 12%, to close at $104.96 per share on July 31, 2014, down $14.68 per share from the prior day's closing price of $119.64 per share.

119.    Thereafter, on October 10, 2014, L-3 filed with the SEC the Amended 10-K, which explained that the Company recorded $169 million in pre-tax adjustments associated with "misconduct and accounting errors" within the Aerospace Systems segment (the "Aerospace Systems financial misstatements"). In addition to the Aerospace Systems financial misstatements, the Amended 10-K disclosed that the financial statements it issued to investors during the Class Period also included errors associated with improperly accounted for sales-type lease transactions and transactions recorded in wrong accounting periods. This action, however, concerns only L-3's Aerospace Systems financial misstatements and not those associated with its improper accounting of sales-type lease transactions and transactions recorded in wrong accounting periods.

120.    The Amended 10-K characterized the Aerospace System financial misstatements as follows: (i) $69 million as being associated with improperly deferred cost overruns, improperly recognized sales, overstated inventory and receivables, and the failure to timely and accurately perform estimates on L-3's U.S. Army C-12 fixed-price maintenance and logistics support contract within its Aerospace Systems segment's Army Sustainment division; (ii) $48 million as being associated with overstated inventory and receivables on other contracts within the Logistics

Solutions sector; and (iii) an additional $52 million of accounting misstatements as being associated with improperly deferred losses within the Aerospace Systems Segment's Platform Systems sector.

121.    The Amended 10-K disclosed that $135 million of the total $169 million in Aerospace System financial misstatements related to the Class Period, with misstatements totaling $60 million, $20 million and $55 million being improperly recorded during the year ended December 31, 2013, the quarter ended March 28, 2014 and the quarter ended June 27, 2014, respectively.

122.    In addition, L-3, in the Amended 10-K, admitted that the above-noted accounting misstatements within its Aerospace Systems segment were attributable to "numerous" and "intentional" overrides of controls, including those associated with:

- Inventory valuations;

- Inventory counts;

- Receivable valuations;

- Contract invoices;

- Contract estimates review and approvals;

- Cost overrun recognition;

- Quarterly financial statement review and analysis; and

- Journal entry preparation, review and approval.

123.    L-3 also admitted that it did not maintain an effective "control environment" at its Aerospace Systems segment. According to the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), the control environment "comprises the integrity and ethical values" of an organization, which is principally established and maintained by a company's board of directors and senior management. Here, the Company has admitted that its board of directors and senior management did not maintain an environment that promoted integrity and ethical values,

notwithstanding L-3's representations during the Class Period that "we operate with integrity, excellence, accountability and respect in everything we do" and "[w]e demonstrate integrity by operating honestly and fairly" and that "[w]e apply our values and principles to our daily business activities and make sure our actions always reflect the highest level of ethical conduct."

124.   In fact, L-3 has admitted that it "did not perform reviews of certain employee concerns regarding violations of the Company's accounting policies" and that, as a result, it plans to strengthen its "procedures for the review of employee concerns regarding violations of the Company's accounting policies. . . ."  Accordingly, L-3 has admitted that it failed to adequately address employee concerns about violations of then-existing accounting policies.

125.   Furthermore, L-3 has now disclosed that, as a result of the foregoing improprieties, it fired its Aerospace Systems segment CFO, the President and General Counsel of the Logistics Solutions sector, and the President and Vice President of Finance of its Army Sustainment division.

### L-3's Admission that Its Financial Misstatements During the Class Period Were Material

126.   While L-3 has not characterized it as such, the Company has now "restated" the financial statements it issued to investors during the Class Period.

127.   GAAP, in ASC Topic 250, provides that errors in the recognition, measurement, presentation, or disclosure of financial data in previously issued financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared are to be corrected by "restating" the previously issued financial statements.

128.   Although the Amended 10-K euphemistically discloses that L-3 has made "revisions" to correct errors in the financial statements it previously issued to investors during the Class Period, ASC's Master Glossary defines the "restatement" of financial statements as being the "process of

'revising previously issued financial statements to reflect the correction of an error' in those financial statements."

129.    Indeed, on September 26, 2014, an Oppenheimer securities analyst characterized the revisions as a "restatement," stating in a research report:

> This morning, LLL announced that it has substantially completed its internal review of the Aerospace Systems segment. Overall, the news was mixed: As this process approaches completion, the magnitude of the **restatement** is being finalized and the 10-Q should be filed in two weeks. However, the size of the **restatement** has roughly doubled, outlook for back-half 2014 has been trimmed, and we're left with some indications that the lapses could have been discovered earlier.

130.    Accordingly, notwithstanding its representations to the contrary, L-3 has *restated* the financial statements it issued to investors during the Class Period. In so doing, L-3 has made the determination that such financial statements were materially misstated because GAAP provides that only materially misstated financial statements need be retroactively restated. *See e.g.*, ASC Topic 250, *Accounting Changes and Error Corrections*, SEC Staff Accounting Bulletin Topic 1-M, *Materiality*, and SEC Staff Accounting Bulletin Topic 1-N, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*.

131.    In failing to file financial statements with the SEC which conformed to GAAP, Defendants disseminated financial statements of L-3 during the Class Period that materially inflated the Company's operating performance. In fact, Defendants have now acknowledged that the Aerospace Systems financial misstatements, including those resulting from the "intentional" override of accounting controls, caused:

- L-3's net income for the year ended December 31, 2013 to be overstated by **5.2%**; and

- L-3's pre-tax income during the quarter ended March 28, 2014 to be overstated by **8.1%.**

132.    These overstatements of income during the Class Period were quantitatively material.

133.    Moreover, GAAP, as articulated in the SEC's Codification of Staff Accounting Bulletins Topic 1M ("CSAB Topic 1M") provides that materiality in the context of a financial misstatement includes an assessment of the magnitude of the misstatement in percentage terms, as well as an assessment of the factual context in which the user of financial statements would view the financial misstatement.   These contexts are referred to in accounting and auditing literature as "quantitative" and "qualitative" factors.

134.    Thus, CSAB Topic 1M provides that "the staff believes that there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material."

135.    For example, CSAB Topic 1M provides that the materiality of a misstatement may turn on where the misstatement appears in the financial statements, including a misstatement associated with the performance of a company's operating segments.  Accordingly, CSAB Topic 1M provides that a misstatement associated with a **"*segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability*"** is one of a number of factors that "may well render material a quantitatively small misstatement of a financial statement item."

136.    Here, the Aerospace Systems segment is part of L-3's core operations, accounting for more than 35% of the Company's operating income and revenues during 2013, and the Aerospace Systems financial misstatements caused the results of L-3's significant Aerospace Systems segment to be materially misstated in the following respects:

- the operating income of the Aerospace Systems segment for the year ended December 31, 2013 was overstated by ***14.2%***;

- the operating margin of the Aerospace Systems segment for the year ended December 31, 2013 was overstated by ***14%***;

- 48 -

- the operating income of the Aerospace Systems segment for the quarter ended March 28, 2014 was overstated by *21.3%*; and

- the operating margin of the Aerospace Systems segment for the quarter ended March 28, 2014 was overstated by *19.3%*.

137.   In addition, CSAB Topic 1M provides that quantitatively small financial misstatements may be material when management has intentionally made adjustments to various financial statement items in a manner inconsistent with GAAP.  Accordingly, CSAB Topic 1M warns that SEC registrants "***should not assume that even small intentional misstatements in financial statements***" are immaterial.

138.   Here, L-3 has admitted that the financial misstatements within its Aerospace Systems segment were caused by the "intentional" override of "numerous" accounting controls, includes those associated with the "review and analysis" (as opposed to the preparation of) division quarterly financial statements, and the "review and approval" (as opposed to the preparation of) contract estimates, and journal entries.  Accordingly, L-3's management, as part of their accounting review and approval processes, intentionally overrode numerous accounting controls.

139.   Lastly, CSAB Topic 1M provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  As noted above, when L-3 made public its financial misstatements, the price of L-3's common stock declined more than 12%, generating a market capitalization loss of approximately $1.25 billion.

### L-3's Financial Misstatements
### Were the Result of Intentional Conduct

140.   Evidencing Defendants' intent to misstate the Company's financial reporting during the Class Period, L-3 has now admitted that:

- it hired independent legal and accounting advisors to conduct an "internal review" into the concerns about the Company's financial reporting and internal controls;

- its previously issued financial statements were materially misstated due to a myriad of accounting improprieties;

- it terminated four employees at its Aerospace Systems segment and one employee at its Aerospace Systems segment "resigned," including the CFO at its Aerospace Systems segment, the President of its Logistics Solutions sector, the General Counsel of its Logistics Solutions sector, and the President and Vice President of Finance at its Army Sustainment division;

- its management, as part of their accounting review and approval processes, intentionally overrode numerous accounting controls which resulted in the need for the Company to restate its previously issued financial statements; and

- the SEC and DOJ are conducting on-going investigations into matters associated with the Company's financial misstatements.

141.    The magnitude of L-3's financial misstatements and the multiplicity of its improper accounting, coupled with the on-going SEC and DOJ investigations, the above-noted management "resignations," material internal control deficiencies, and numerous intentional accounting control circumventions are not indicative of innocent record keeping mistakes.  Rather, they evidence fraudulent financial reporting.

142.    Moreover, an investigation by Plaintiffs' counsel has determined that L-3 terminated the Vice President of Finance at its Army Sustainment division in January 2014.  Accordingly, *L-3's senior management caused the Company to issue financial statements for the year ended December 31, 2013 and the quarter ended March 28, 2014, notwithstanding knowledge of wrongful conduct alleged herein (which was sufficient to terminate L-3's Army Sustainment division Vice President of Finance prior thereto)*.

143.    In addition, Plaintiffs' counsel's investigation has determined that the "employee complaint" associated with the wrongful conduct alleged herein was made *prior to* the Company's issuance of its materially misstated financial statements for the quarter ended March 28, 2014 and

that the Company has now admitted that it "did not perform reviews of certain employee concerns regarding violations of the Company's accounting policies and [internal controls over financial reporting] in a sufficient and effective manner."

144.    These facts portray a deliberate practice of conscious misconduct within L-3's management that was designed to, and did, materially inflate the Company's operating results during the Class Period.

## L-3's Violations of GAAP

145.    Defendants had the responsibility to present L-3's business activities in accordance with Section 13 of the Exchange Act of 1934, which provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -
>
> A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -
>
> i.    transactions are executed in accordance with management's general or specific authorization;
>
> ii.    transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;
>
> iii.    access to assets is permitted only in accordance with management's general or specific authorization; and
>
> iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

146.     As it has now admitted, L-3's financial reporting during the Class Period violated numerous provisions of GAAP, including those that it deemed to be "critical" accounting policies, which caused a material inflation of its true financial results.

**Improper Recognition of Revenue**

147.     GAAP, in ASC Topic 605, provides two acceptable methods of accounting for long-term construction-type contracts: the "percentage-of-completion" and "completed-contract" methods.  These accounting methods are not intended to be interchangeable, and "percentage-of-completion" accounting should be used *when an entity can reasonably and dependably estimate revenues and costs*.  Accordingly, if reasonably dependable estimates cannot be made or if there are inherent hazards that make estimates doubtful, the completed-contract method is to be used.

148.     The percentage-of-completion method provides for the recognition of revenue and costs as work under the contract progresses, while no revenue is recognized until performance is completed or substantially completed under the completed-contract method.  If it is determined that a contract will result in a loss, *the entity is required to recognize a provision for the entire expected loss in the period when the loss becomes evident*.

149.     During the Class Period, L-3 falsely represented that it complied with these accounting rules.  In its financial statements for the year ended December 31, 2013, filed with the SEC on Form 10-K, L-3 disclosed the following with respect to its policy of revenue recognition, stating, in pertinent, as follows:

> Substantially all of the Company's sales are generated from written contractual (revenue) arrangements.  The sales price for the Company's revenue arrangements are either fixed-price, cost-plus or time-and-material type.  Depending on the contractual scope of work, the Company utilizes either contract accounting standards or accounting standards for revenue arrangements with commercial customers to account for these contracts.  Approximately 47% of the Company's 2013 sales were accounted for under contract accounting standards, of which approximately 38% were fixed-price type contracts and approximately 9% were cost-plus type contracts. For contracts that are accounted for under contract accounting standards, sales and

profits are recognized based on: (1) a Percentage-of-Completion (POC) method of accounting (fixed-price contracts), (2) allowable costs incurred plus the estimated profit on those costs (cost-plus contracts), or (3) direct labor hours expended multiplied by the contractual fixed rate per hour plus incurred costs for material (time-and-material contracts).  Aggregate net changes in contract estimates increased operating income by $106 million, or 8%, for the year ended December 31, 2013, $78 million, or 6%, for the year ended December 31, 2012, and $73 million, or 5%, for the year ended December 31, 2011.

Sales and profits on fixed-price type contracts covered by contract accounting standards are substantially recognized using POC methods of accounting.  Sales and profits on fixed-price production contracts under which units are produced and delivered in a continuous or sequential process are recorded as units are delivered based on their contractual selling prices (the "units-of-delivery" method).  Sales and profits on each fixed-price production contract under which units are not produced and delivered in a continuous or sequential process, or under which a relatively few number of units are produced, are recorded based on the ratio of actual cumulative costs incurred to the total estimated costs at completion of the contract, multiplied by the total estimated contract revenue, less cumulative sales recognized in prior periods (the "cost-to-cost" method).   Under both POC methods of accounting, a single estimated total profit margin is used to recognize profit for each contract over its entire period of performance, which can exceed one year.  Losses on contracts are recognized in the period in which they become evident.  The impact of revisions of contract estimates, which may result from contract modifications, performance or other reasons, are recognized on a cumulative catch-up basis in the period in which the revisions are made.

Sales and profits on cost-plus type contracts covered by contract accounting standards are recognized as allowable costs are incurred on the contract, at an amount equal to the allowable costs plus the estimated profit on those costs.  The estimated profit on a cost-plus type contract is fixed or variable based on the contractual fee arrangement.  Incentive and award fees are the primary variable fee contractual arrangements.  Incentive and award fees on cost-plus type contracts are included as an element of total estimated contract revenues and are recorded as sales when a basis exists for the reasonable prediction of performance in relation to established contractual targets and the Company is able to make reasonably dependable estimates for them.

150.    L-3 has now acknowledged that its contract (revenue arrangement) estimates were not reasonably dependable.  As a result, L-3 was foreclosed from using the percentage-of-completion method of accounting on certain of its Aerospace System segment contracts, including the U.S. Army C-12 fixed-price maintenance and logistics support contract.

- 53 -

151.    In addition, L-3 failed to recognize the entire expected loss on, at least, the U.S. Army C-12 fixed-price maintenance and logistics support contract in the period such losses became evident.  L-3 has now admitted that it failed to record $69 million of losses associated with, among others, contract overruns when management intentionally falsified the preparation, review and approval of contract estimates.

**Improper Deferral of Expenses**

152.    GAAP, in ASC Topic 450, requires financial statements to recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable (*i.e.*, likely) that an asset has been impaired or a liability has been incurred, and the amount of such loss can be reasonably estimated.

153.    In addition, GAAP, in ASC Topic 330, provides that inventories be stated at cost, except when the utility of goods, in their disposal in the ordinary course of business, will be less than cost, the difference shall be recognized as a loss of the current period.

154.    L-3 has now admitted that it failed to record $69 million of losses associated with, among others, contract overruns and overstated receivables and inventories on the U.S. Army C-12 fixed-price maintenance and logistics support contract.  In addition, L-3 has admitted that it failed to record $48 million of losses associated with unrecorded liabilities and overstated inventories and receivables on other contracts.  Finally, L-3 has admitted that it failed to record losses totaling $37 million on aircraft modification contracts and $15 million on aerostructures for a new commercial aircraft.

155.    In failing to file financial statements with the SEC which conformed to the requirements of GAAP, L-3 disseminated financial statements that were presumptively misleading and inaccurate.

- 54 -

156.    In addition, the Company's Class Period Forms 10-K and 10-Q filed with the SEC were materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

## ADDITIONAL SCIENTER ALLEGATIONS

157.    As alleged herein, L-3 and the Individual Defendants acted with scienter in that they knew and/or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding L-3, their control over, and/or receipt and/or modification of L-3's allegedly materially misleading statements and/or their associations with the Company, which made them privy to confidential proprietary information concerning L-3, participated in the fraudulent scheme alleged herein.

158.    Additionally, Defendant Strianese was motivated to consciously and/or recklessly make false and misleading statements and omissions in order to sell shares of his personally-held L-3 common stock at inflated prices, yielding net proceeds of approximately $11.3 million during the Class Period, as the following chart demonstrates:

| Name | Title | Date | Shares | Transaction | Price | Proceeds (Cost) |
|---|---|---|---|---|---|---|
| Strianese (Michael T) | Chief Executive Officer | 03-Feb-2014 | 54,367 | Option Exercise | $69.18 | ($3,761,109) |
| Strianese (Michael T) | Chief Executive Officer | 03-Feb-2014 | (26,720) | Sale | $108.87 | $2,909,006 |
| Strianese (Michael T) | Chief Executive Officer | 03-Feb-2014 | (24,050) | Sale | $109.74 | $2,639,247 |
| Strianese (Michael T) | Chief Executive Officer | 03-Feb-2014 | (100) | Sale | $111.54 | $11,154 |
| Strianese (Michael T) | Chief Executive Officer | 03-Feb-2014 | (3,497) | Sale | $110.83 | $387,573 |
| Strianese (Michael T) | Chief Executive Officer | 04-Feb-2014 | 104,367 | Option Exercise | $77.03 | ($8,039,390) |
| Strianese (Michael T) | Chief Executive Officer | 04-Feb-2014 | (600) | Sale | $108.87 | $65,322 |
| Strianese (Michael T) | Chief Executive Officer | 04-Feb-2014 | (74,167) | Sale | $108.38 | $8,038,219 |
| Strianese (Michael T) | Chief Executive Officer | 04-Feb-2014 | (800) | Sale | $108.76 | $87,008 |
| Strianese (Michael T) | Chief Executive Officer | 04-Feb-2014 | (28,800) | Sale | $107.22 | $3,087,936 |
| Strianese (Michael T) | Chief Executive Officer | 24-Feb-2014 | (14,207) | Sale | $116.91 | $1,660,940 |
| Strianese (Michael T) | Chief Executive Officer | 25-Feb-2014 | (10,793) | Sale | $114.60 | $1,236,878 |
| Strianese (Michael T) | Chief Executive Officer | 14-May-2014 | 60,000 | Option Exercise | $70.53 | ($4,231,800) |
| Strianese (Michael T) | Chief Executive Officer | 14-May-2014 | (60,000) | Sale | $120.70 | $7,242,000 |
| | | | | **Class Period Net Proceeds:** | | **$11,332,984** |

159.    These sales were unusual and suspicious, as they occurred near the time when the alleged material misstatements and omissions were made and after the Whistleblower reported his concerns to L-3's corporate headquarters.  These sales were also unusual for Strianese because, during the six months prior to the Class Period, Strianese's transactions in his personally held L-3 common stock yielded net proceeds of only $3.4 million.

160.    Furthermore, Defendants were motivated to perpetrate this fraud in order to complete two debt offerings during the six-month Class Period.  On May 28, 2014, L-3 completed its underwritten public offering of $350 million aggregate principal amount of 1.50% Senior Notes due 2017 and $650 million aggregate principal amount of 3.95% Senior Notes due 2024.  However, at no point prior to the completion of these offerings did L-3 disclose the concerns reported by the Whistleblower.

## NO SAFE HARBOR

161.    The "Safe Harbor" warnings accompanying L-3's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's

financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

162.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of L-3 who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

163.   Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's common stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)   Plaintiffs and other members of the Class purchased L-3 common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

164.    At all relevant times, the market for L-3 common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, L-3 filed periodic public reports with the SEC; and

(b)    L-3 regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

165.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of L-3 common stock and operated as a fraud or deceit on Class Period purchasers of L-3 common stock by misrepresenting the value of the Company's business and prospects.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of L-3 common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of L-3 common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

166.    Specifically, on July 31, 2014, before the market opened, Defendants disclosed that second quarter 2014 financial results were "preliminary because the Company is currently conducting an internal review that could result in increases to the preliminary adjustments included in this release," and that at the center of that internal review were allegations of misconduct and accounting errors.  In response, the price of L-3 common stock fell from $118.35 per share the previous day, to close at $103.83 per share, down approximately $15 per share, or 12%, from its close the prior day, on very unusual high trading volume of more than 5.4 million shares trading.

167.    The decline in the price of L-3 common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price declines in L-3 common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of L-3 common stock and the subsequent significant decline in the value of L-3 common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### ANALYSTS REACTED NEGATIVELY TO DEFENDANTS' DISCLOSURES

168.    During the July 31, 2014 earnings call and in subsequent written reports, securities analysts expressed their concern with Defendants' disclosure of intentional misconduct and accounting misstatements.

169.    During the call, a Shapiro Research analyst expressed concern about L-3 management's controls.  The following exchange took place:

**George Shapiro - Shapiro Research - Analyst**

*I guess my question really gets along to kind of management controls.  If this contract has been ongoing since I think you said December 2010, what took so long to find out what's going on and how do we get confidence that this is not -- we are not going to find stuff elsewhere*?

**Michael Strianese - L-3 Communications Holdings, Inc. - Chairman, President & CEO**

George, we have really no indication that there is anything elsewhere.  And in terms of what took so long, well, you presume the issue began when the contract began, which I don't believe is the case, but I am really restricted into getting into details given the ongoing nature of the matter.

- 59 -

170.    Analysts were also concerned about the pervasiveness of the misconduct.   The following exchange took place during the call:

**Joe Nadol - JPMorgan - Analyst**

Okay, so the natural question is how far along are you in your investigation?  How long has this been going on?  How long have you known about this?  And how much conviction do you have that --?  I know you say this is isolated to the one contract, but --.

**Ralph D'Ambrosio - L-3 Communications Holdings, Inc. - SVP & CFO**

We said it was primarily isolated to one contract. . . .

**Joe Nadol - JPMorgan - Analyst**

***How do we know?  The big question everyone is going to be wondering is -- whether this one contract is $84 million or $120 million isn't the issue, it's is this possibly pervasive elsewhere on other fixed price contracts within this segment***?

**Michael Strianese - L-3 Communications Holdings, Inc. - Chairman, President & CEO**

Again, as you know, it is -- I keep having to repeat it -- ongoing.  But as to what we know as of this morning, there has been nothing identified that suggests that this was beyond the borders that we have found, nor involving employees beyond those that have already been terminated.

We don't have that absolute assurance because we are not complete yet, but with every day that goes by we get more confident when nothing else comes up.  But, again, we want to run this to completion and, as you know, we will.

171.    Although Strianese sought to inspire confidence in the Company's internal controls by proclaiming that L-3's internal control system worked because the Company found the misconduct, analysts were incredulous.  The following exchange took place during the July 31 call:

**Ron Epstein - BofA Merrill Lynch - Analyst**

Good morning, thanks for taking my question.  Not to beat a dead horse, but I'm going to a little bit here.  My apologies for that in advance.

***Can you give us more color around just the point of failure?  In your prepared remarks you mentioned that your internal system did work because you found it. And I guess maybe Joe was driving at this a little bit, but it happened in the first place***.

- 60 -

I guess you will see it in the market today. The worry will be just -- and I know you have said you haven't seen any place else, but *__how can you make investors feel comfortable that it really is contained? Can you tell us what the point of failure was and how you can assure us it's not going to happen again__*?

**Michael Strianese - L-3 Communications Holdings, Inc. - Chairman, President & CEO**

Again, Ron, the investment -- the inquiry is ongoing. The corporate review is ongoing and we have outside experts engaged, including some very high-power resources in the field.

*__But the people involved have been fired. They are gone. So that gives me a lot of confidence that that was the failure point because we have some bad actors and they are no longer part of L-3__*. And that is my answer.

172.    On July 31, 2014, an Oppenheimer analyst noted, in a research report, the devastating impact of Defendants' disclosure on investor confidence, and the concern that the misconduct was discovered by a whistleblower, rather than corporate controls:

LLL had a mostly solid performance in 2Q but also uncovered financial misconduct stretching back to 2011 at the Aerospace segment. At least five employees at multiple levels of LLL were involved in a scheme that inflated income by overreporting revenue and underreporting expenses on a $150M/yr maintenance contract. The discovery reduces previously reported income by a total of $84M. *__But the bigger impact is to investor confidence__*. LLL believes it has discovered the whole of the misconduct. We have no specific reason to doubt it, but experience teaches that plots of this ilk often thicken before they dissolve. *__Also less than reassuring is that the misconduct was discovered by a whistleblower, according to the WSJ, rather than corporate controls__*.

173.    On the same day, a Drexel Hamilton analyst echoed the damage done by the disclosure to investor confidence in L-3:

We are downgrading our rating on shares of LLL to Hold this morning following the firm's announcement that it is conducting an internal review related to an accounting issue at its Aerospace Systems unit. Shares are up 12.0% YTD and are likely to struggle in light of the announcement this morning, in our view.

•    The firm will take an $84m pre-tax charge related to the issue and results this morning are viewed as preliminary in light of the review.

- *While we view the issue as likely isolated, we think the market will take some time to regain confidence in LLL given current skittishness we have observed in the market*.

174.   On August 1, 2014, an RBC Capital Markets analyst also noted the damage done by Defendants to investor confidence:

**There goes 16% of the market cap**

Accounting issues in companies tend to prompt a violent reaction, and L-3's share price was duly hammered on the back of this news. *Management tried to reassure investors that the issue is isolated, but clearly many do not want to stick around to see if this is true. . . . Whilst the stock could regain some of yesterday's sell off, it may be a while before investors fully regain their confidence*.

175.   Even after the Company had announced the conclusion of its internal review, analysts remained cautious.  On October 13, 2014, a Drexel Hamilton analyst wrote: "*We expect the firm may eventually put this unfortunate episode in the past, but we think it will take at least a couple of quarters for the market to regain confidence in LLL*."

176.   Likewise, on October 28, 2014, a JPMorgan analyst questioned the impact of newly announced charges on the future profitability of the Aerospace Systems segment:

**Impact of additional charges on future Aerospace profitability is a key question.**

We know that the C-12 contract that initially led to the accounting review expires in January of next year, so the potential for lingering pressure from that contract is relatively limited.  *However, as mentioned, the review led to additional charges in the Logistics Solutions and Platform Systems sectors and the future impact of those discoveries remains to be seen*.  The net impact of those charges on operating income was $9 mn in 2012, $25 mn in 2013 and $60 mn in 1H14.  The 1H14 figure probably includes some one-time catch-ups but *the overall charges are in part due to improper accruals on certain logistics support contracts as well as losses on four aircraft contracts, so there is likely to be some ongoing pressure from those issues. Given the ramp of the charges, we can envision these pressures lasting into 2016 and we are reducing our Aerospace margin forecasts for 2015 and 2016 by 100 bps and 70 bps, respectively, to 9.5% and 9.6%*.  On the Q2 call management had indicated that its initial 2015 outlook, including 30 bps of y/y expansion in core margin for the entire company, was unchanged by the preliminary findings of the review, and *a key question this earnings call will be if that outlook remains intact following the incremental discoveries in the Aerospace segment*.

177.    On October 30, 2014, a Barclays analyst noted "cautious sentiment from investors" arising from the Company's internal controls issues:

> *We noted cautious sentiment from investors we spoke to going into the print, which is understandable given the nature of the internal controls issues*, but the quarterly performance itself was not as important as the sentiment around forward-looking impacts.  LLL continues to offer a similar value proposition as other defense primes, *albeit with slightly greater risk in the eyes of many investors over the last quarter*.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against L-3

178.    Plaintiffs incorporate ¶¶1-177 by reference.

179.    During the Class Period, L-3 disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

180.    L-3 violated §10(b) of the Exchange Act and Rule 10b-5 in that it: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of L-3 common stock during the Class Period.

181.    L-3's knowledge of the falsity of its public statements is demonstrated by the statements of FE1.

182.    As described in ¶76, FE1 explained that the Whistleblower reported his concerns, *i.e.*, "blew the whistle," to L-3's New York corporate office in December 2013.  This timing is further corroborated by the departure of ASD vice president of finance David Pruitt in January 2014.

Moreover, Pruitt reasonably could not have been terminated for intentional misconduct without L-3 senior management's knowledge.  Thus, before the Class Period began on January 30, 2014, L-3 was aware of the allegations of fraud lodged by the Whistleblower.  Accordingly, L-3's senior management caused the Company to issue financial statements for the year ended December 31, 2013 and the quarter ended March 28, 2014, notwithstanding knowledge of wrongful conduct alleged herein (which was sufficient to terminate L-3's ASD vice president of finance prior thereto).  These facts create a strong inference that someone whose intent could be imputed to L-3 acted with the requisite scienter.

183.    In addition, L-3 admitted to intentional misconduct by at least four members of the senior management of its Aerospace Systems segment, all of whom were fired by L-3.  These facts also create a strong inference that someone whose intent could be imputed to L-3 acted with the requisite scienter.

184.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for L-3 common stock.  Plaintiffs and the Class would not have purchased L-3 common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by L-3's misleading statements.

### COUNT II

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against the Individual Defendants**

185.    Plaintiffs incorporate ¶¶1-184 by reference.

186.    During the Class Period, the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

187.     The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of L-3 common stock during the Class Period.

188.     The following facts, viewed holistically, establish the Individual Defendants' scienter:

(a)     The Whistleblower reported his concerns to L-3 senior management before the Class Period even began, resulting in the undisclosed termination of the ASD vice president of finance prior to the start of the Class Period;

(b)     Prior to the Class Period, the Individual Defendants were on alert that they needed to maintain an effective process to address concerns of whistleblowers and root out employee misconduct.  During that time, Defendant Strianese was personally involved in overseeing the Company's response to reports of misconduct reported on its whistleblower hotline;

(c)     The Individual Defendants failed to check information they had a duty to monitor;

(d)     Senior management of the Aerospace Systems segment committed intentional misconduct;

(e)     Government investigations of the wrongful conduct at the Company are ongoing;

(f)     The Company committed significant violations of GAAP;

(g)     Negative free cash flow was a red flag of misconduct occurring in the C-12 contract; and

(h)     The Individual Defendants were motivated to perpetuate the fraud in order to complete two debt offerings during the Class Period.

189.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for L-3 common stock.  Plaintiffs and the Class would not have purchased L-3 common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

## COUNT III

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

190.    Plaintiffs incorporate ¶¶1-189 by reference.

191.    During the Class Period, the Individual Defendants participated in the operation and management of L-3, and conducted and participated, directly and indirectly, in the conduct of L-3's business affairs.  Because of their senior positions, they knew the adverse non-public information about L-3's false financial statements and materially weak internal controls.

192.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to L-3's financial condition and results of operations, and to correct promptly any public statements issued by L-3 which had become materially false or misleading.

193.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which L-3 disseminated in the marketplace during the Class Period concerning L-3's

results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause L-3 to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of L-3 within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of L-3 common stock.

194.    Each of the Individual Defendants, therefore, acted as a controlling person of L-3.  By reason of their senior management positions and/or being directors of L-3, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, L-3 to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of L-3 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

195.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by L-3.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the

Court.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  March 13, 2015                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD
                                          ALAN I. ELLMAN


                                          _/s/ David A. Rosenfeld_
                                          DAVID A. ROSENFELD

                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com
                                          drosenfeld@rgrdlaw.com
                                          aellman@rgrdlaw.com

                                          _Lead Counsel for Lead Plaintiffs_

                                          VANOVERBEKE, MICHAUD
                                          & TIMMONY, P.C.
                                          THOMAS C. MICHAUD
                                          79 Alfred Street
                                          Detroit, MI  48201
                                          Telephone:  313/578-1200
                                          313/578-1201 (fax)
                                          tmichaud@vmtlaw.com

                                          _Additional Counsel for Plaintiffs_

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on March 13, 2015, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


_____
                    */s/ David A. Rosenfeld*
                    DAVID A. ROSENFELD