USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____3/30/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
ZUBAIR PATEL, individually and on behalf of all : others similarly situated,
:
:
                             Plaintiff,:
:
             -against-           :          14-CV-6038 (VEC)
:
L-3 COMMUNICATIONS HOLDINGS INC., :        MEMORANDUM
MICHAEL T. STRIANESE, and RALPH G. :       OPINION & ORDER
D'AMBROSIO,
:
:
                        Defendants,:
-----------------------------------------------------------X
ALAN NGUYEN, individually and on behalf of all : others similarly situated,
:
:
                       Plaintiff, :
:
            -against-          :
:
L-3 COMMUNICATIONS HOLDINGS INC., :       14-CV-6182 (VEC)
MICHAEL T. STRIANESE, and RALPH G. :
D'AMBROSIO,
:
:
                   Defendants. :
----------------------------------------------------------- X
CARMEN VALENTINO, individually and on : behalf of all others similarly situated,
:
:
                       Plaintiff, :
:
            -against-          :
:
L-3 COMMUNICATIONS HOLDINGS INC., :       14-CV-6939 (VEC)
MICHAEL T. STRIANESE, and RALPH G. :
D'AMBROSIO,
:
:
                   Defendants.:
----------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Lead Plaintiffs City of Pontiac General Employees' Retirement System, Local 1205 Pension Plan, and City of Taylor Police and Fire Retirement System, on behalf of themselves and all others who purchased L-3 Communications Holdings, Inc. ("L-3") common stock between January 30, 2014, and July 30, 2014 ("Class Period"), bring this action against L-3, Michael Strianese, the Chief Executive Officer ("CEO") of L-3, and Ralph D'Ambrosio, the Chief Financial Officer ("CFO") of L-3, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a).  Plaintiffs allege that all of L-3's reported financial statements during the Class Period were materially false and misleading due to accounting improprieties in one of L-3's business segments.

Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(1)-(3)(A), for failure to plead fraud with particularity.  Because Plaintiffs do not adequately allege scienter as to Strianese and D'Ambrosio (together, the "Individual Defendants") as required for Sections 10(b) and 20(a), Defendants' Motion to Dismiss is GRANTED as to the Individual Defendants. Defendants' Motion is DENIED as to L-3 because Plaintiffs adequately allege scienter and materiality as to L-3.  Furthermore, Lead Plaintiffs' Motion to Strike an exhibit relied upon by Defendants in their Motion to Dismiss is DENIED as moot.

## BACKGROUND[1]

L-3 sells military and civil equipment and services related to, *inter alia*, communications, intelligence, reconnaissance, avionics, space, and navigation to the United States government

---

[1]     For the purposes of this motion, the Court assumes the well-pled factual allegations of the Second Consolidated Amended Complaint to be true.  *See Turkmen v. Hasty*, 789 F.3d 218, 233 (2d Cir. 2015).

and others.  Second Consolidated Amended Compl. ("SCAC") ¶¶ 15, 30 (Dkt. 33).  L-3 is one of the top ten U.S. government contractors, is headquartered in New York City, and has eighty-six million outstanding shares of common stock.  *Id.* ¶¶ 15, 30.  Lead Plaintiffs purchased L-3 shares between January 30, 2014, and July 30, 2014.  *Id.* ¶¶ 12-14.  Strianese is and was at all relevant times President and CEO, Chairman of the Board of Directors, and a member of the Executive Committee of L-3.  *Id.* ¶ 16.  D'Ambrosio is and was at all relevant times Senior Vice President and CFO of L-3.  *Id.* ¶ 17.  L-3 is divided into four business segments, one of which is Aerospace Systems, comprising 36% of L-3's net sales.  *Id.* ¶ 31.  Lead Plaintiffs' fraud allegations arise out of a contract between L-3 and the U.S. Army, pursuant to which Aerospace Systems serviced U.S. Army C-12 airplanes (the "C-12 Contract").  *Id.* ¶ 42.  The C-12 Contract ran from the end of 2010 to January 2015.  *Id.* ¶ 58.

Lead Plaintiffs base their allegations, in part, on interviews with two former L-3 employees.  *Id.* ¶ 39.  Former Employee Number One ("FE1") worked in the Army Support Section, located in Huntsville, Alabama, a subdivision of the Army Sustainment Division ("ASD"), which is itself a subdivision of Aerospace Systems.  *Id.* ¶ 41.[2]  From March 2013 through March 2014, FE1 was an Aircraft Engine Manager, and from March 2014 through October 2014, he was a Ground Support Equipment Manager.  *Id.* ¶ 42.  FE1's responsibilities included preparing monthly forecasts of the number of engine overhauls to be performed under the C-12 Contract.  *Id.*  Former Employee Number Two ("FE2") immediately preceded FE1 as Engine Manager, working in that position from October 2010 through January 2013, at which point he became Aircraft Maintenance Manager/Assistant Director of Maintenance until July 2013.  *Id.* ¶¶ 56, 57.  FE2's responsibilities in his first position included managing repairs,

---

[2]      Aerospace Systems is divided into the Logistics Solutions Center and the Platform Systems Sector.  SCAC ¶ 4 n.1.  ASD falls under the Logistics Solutions Center.  *Id.*

overhauls, and inspections of airplane engines, while his responsibilities in his second position included managing maintenance for approximately two hundred Army aircraft and controlling the daily activities of five regional managers and over four hundred U.S. and overseas mechanics.  *Id.* ¶ 57.  The senior-most executive to whom FE1 reported was Rick Schmidt, later replaced by Roderick Hynes, who was the Program Director of the Army Support Section.  *Id.* ¶ 44.  The Program Director reported to the ASD Vice President and CFO, David Pruitt; Pruitt reported to the ASD President, Mark Wentlent; Wentlent reported to the Aerospace Systems CFO, Gordon Walsh.  *Id.*  According to Lead Plaintiffs, an employee who was on the same reporting level as FE1 within the Army Support Section (the "Whistleblower") allegedly alerted L-3 to accounting fraud taking place related to the C-12 Contract.  *Id.* ¶¶ 6, 45.

### A.  The C-12 Contract

According to FE2, from early on, the C-12 Contract incurred cost overruns that the Government would not reimburse.  *Id.* ¶¶ 59, 67.  FE1 also noted that the financing for the C-12 Contract was in "serious disarray" and was in "Red" status (meaning losing money) when he started working for L-3.  *Id.* ¶ 68.  The C-12 Contract had two parts: for the maintenance and logistics portion, the Government was billed at a fixed price, meaning L-3 had to cover costs that exceeded the fixed price; for the second portion, L-3 could bill overrun costs "outside of routine repair and maintenance" to the Government.  *Id.* ¶ 58.  The C-12 Contract was priced inaccurately, according to FE2, because the L-3 division that executed the C-12 Contract was not the division that had prepared the proposal for the deal, and the proposal included fixed-price terms that were not economically viable.  *Id.* ¶ 60.[3]  In response to the cost overruns, L-3

---

[3]   The SCAC provides neither the basis for FE-2's knowledge regarding the genesis of the contract nor the basis for his opinion that the terms were not economically viable.

assembled a team of L-3 employee experts, a so-called "Red Team," to investigate and resolve this issue.  *Id.* ¶ 59.  Wentlent led one of the Red Teams, and Pruitt led a later one.  *Id.*

Lead Plaintiffs allege that the problems with the C-12 engine overhaul estimates described by FE1 support their accounting fraud allegations.  FE1 compiled into a spreadsheet his monthly forecasts of the number of engines to overhaul, which was difficult to do accurately because the Army did not rigidly adhere to its maintenance schedules; these monthly forecasts were called short-term integrated forecasts ("STIFs").  *Id.* ¶¶ 46, 47.  FE1 regularly presented the STIFs to the Whistleblower so that the managers could meet monthly to finalize the estimates. *Id.* ¶¶ 47, 48.  Once the managers had finalized the estimates, they were sent for approval to the Army Support Section Program Director, Schmidt and later Hynes, and then to the CFO of ASD, Pruitt, and finally to the CFO of Aerospace Systems, Walsh.  *Id.* ¶ 47.

According to FE1, there was pressure to increase the estimates.  *Id.* ¶ 49.[4]  The managers were allegedly "bludgeon[ed]" during their monthly meetings to make their numbers.  *Id.* ¶ 48.[5] During one meeting attended by FE1, the Whistleblower, and Schmidt, the Whistleblower told Schmidt that the numbers could not be achieved, and Schmidt responded, "unf\*ck this" and "get us what we need."  *Id.* ¶ 53.  According to FE1, the Whistleblower attended "many" meetings with unnamed "higher-ups" who "put the screws" to the Whistleblower.  *Id.*  Wentlent purportedly told FE1 to "push the engines," and on one occasion on an unspecified date, Wentlent told FE1 to bring in more revenue regardless of where it came from.  *Id.* ¶ 52.  The

---

[4]       Significantly, it is not alleged that FE1 reports that there was pressure to falsify the estimates.  With a contract that is losing money, it is not surprising that L-3 pressured people working on the C-12 Contract to increase their throughput of work (*i.e.*, complete more engines per month); that fact does not suggest fraud or misconduct.

[5]       There is no allegation in the SCAC that the individuals who were allegedly "bludgeoning" others were suggesting or encouraging false reporting, as opposed to encouraging employees to achieve the throughput they had estimated in the STIF.

SCAC alleges that FE1 understood Wentlent to mean that he should get revenue not only from engines but also from "hot inspections" and landing gear or props. *Id.*[6] In October 2013, FE1 ran into Wentlent in the hallway and told him he had already achieved his forecasted goal of four engines, to which Wentlent responded, surprised, "Four engines? You mean eight." *Id.* ¶ 49. FE1 allegedly agreed with him and later asked the Whistleblower if he had changed FE1's STIF numbers; the Whisteblower replied that he could not discuss it, but that FE1 should just worry about his four estimated engines. *Id.* For unexplained reasons, FE1 understood this to mean that the Whistleblower was going to ensure that the correct numbers were reported in the STIF. *Id.* FE1 had a similar conversation with the Whistleblower in December 2013. *Id.* ¶ 50. According to FE1, as of December 2013, there were rumors about serious problems or "foul play" regarding the C-12 Contract. *Id.* ¶ 51.[7]

FE1 also noted other conduct regarding the C-12 Contract that was allegedly improper. For example, FE1 thought that the four inventory audits he participated in at some unspecified time were "a waste of time" because the inventory lists did not match what L-3 had in stock. *Id.* ¶ 54.[8] FE1 allegedly saw a document that showed that L-3's C-12 program had all of the required landing gear inventory in stock, but FE1 knew that heavy gears were not in stock. *Id.*[9] In addition, FE1 stated that L-3 created an additional contract line-item number ("CLIN 9") to

---

[6]     The SCAC neither explains why FE1 interpreted Wentlent's comment this way nor how, if at all, the admonition to increase revenue, including from "hot inspections" (whatever that might be), landing gears, and props, relates to the accounting fraud eventually disclosed by L-3.

[7]     The SCAC does not allege who started or who perpetrated the rumor; there is no allegation regarding what the rumored "foul play" was; and there is no indication whether the rumored problem went beyond the fact that C-12 was losing money and ventured into accounting fraud.

[8]     Of course, the entire point of doing audits is to conform records to reality. There is no allegation in the SCAC that FE1 was told not to conform the inventory lists he was provided to the parts that he had in stock.

[9]     Although the SCAC alleges that Tim Oliver, the Engine Manager who succeeded FE1 in March 2014, and Brad Hall, Maintenance Director in the Army Support Section, told FE1 not to tell Walsh that they did not have heavy gears in stock, the SCAC neither alleges when that conversation occurred nor its context. *Id.* ¶¶ 44, 54.

account for cost overruns that were not reimbursed by the Government; FE1 believes CLIN 9 was Walsh's idea.  *Id.* ¶¶ 55, 70.[10]  FE2 believed that CLIN 9's purpose was to make the C-12 Contract appear profitable and to defer losses.  *Id.* ¶ 67.[11]  According to FE1, many of the costs should not have been included in CLIN 9 because the Government would not reimburse them under the C-12 Contract.  *Id.* ¶ 69.[12]  The Program Director, Schmidt and later Hynes, or the Program Manager had to approve the CLIN 9 costs.  *Id.*[13]

### B.  Defendants' Knowledge of the C-12 Contract Problems

In early 2011, FE2 participated in almost daily conference calls with unnamed personnel from L-3 headquarters regarding the C-12 Contract cost overruns.  *Id.* ¶¶ 71, 72.  According to FE2, Walsh was "involved" and "would have been aware" that the Army Support Section in Huntsville was speaking directly to corporate headquarters.  *Id.* ¶ 71.[14]  After approximately one month, FE2 was no longer asked to join these calls.  *Id.* ¶ 72.  FE2 speculates that the Red Teams were "most likely" created as a result of these Huntsville calls with L-3 headquarters.  *Id.*

---

[10]    The SCAC provides no explanation why FE1 believed CLIN 9 originated with Walsh.  The SCAC also does not allege that the amounts charged to CLIN 9 were actually charged to the Army, nor does it describe how the costs charged to CLIN 9 were accounted for on L-3's books.

[11]    The SCAC explains neither how charging costs to CLIN 9 would accomplish the goal of increasing the appearance of profitability nor the basis for FE2's belief that that was the purpose of CLIN 9.

[12]    There is some indication in the SCAC that FE1 might not have entirely understood the billing for this contract.  On the one hand, the SCAC suggests that CLIN 9 was fraudulent, *see* SCAC ¶¶ 67, 70, but elsewhere implies that some of the expenses charged to CLIN 9 were reimbursable by the Government, *see id.* ¶ 69.  Moreover, the SCAC simultaneously implies that there were disputes between L-3 and the Government about what was and was not reimbursable under the C-12 Contract, not an unusual situation in government contracting.  *See id.* (Government "argued" certain "over-and-above" costs were not reimbursable under the contract).

[13]    The SCAC provides no explanation why, if CLIN-9 were intended to further a fraudulent purpose, the Company imposed limits on what could be charged to CLIN-9.  Notably, there is no allegation that any of the employees who signed off on charges to CLIN-9 were fired when the accounting problems were discovered.

[14]    According to the SCAC, FE2 did not specify that Walsh participated in the telephone calls.  Moreover, there is no allegation that the call participants discussed anything other than the fact that the contract was losing money; there is no suggestion that these discussions included facts related to the eventually-discovered accounting fraud.

According to FE1, in late summer or early fall 2013, Strianese came to Huntsville for two to three days for meetings with senior executives. *Id.* ¶ 73. FE1 believes that Strianese would not have visited unless there was a real problem. *Id.*[15] FE1 also believes that the Whistleblower possibly attended one of the meetings with Strianese because he wore a suit to work one day when Strianese was present, and it was uncommon for him to wear a suit to work. *Id.* ¶ 73 n.5.

In addition, according to FE1, in late December 2013 or early January 2014, Pruitt was demoted from Vice President and CFO of ASD to a director position and was fired seven to ten days later. *Id.* ¶ 74. According to FE1, after Pruitt left, it was allegedly "obvious that something was going on." *Id.* By February or March 2014, FE1 heard rumors[16] that someone had intentionally changed the STIF numbers, that other financial problems had been discovered, and that the Whistleblower had "blown the whistle" about the alleged improprieties witnessed by FE1. *Id.* ¶ 75.[17]

Also in February or March 2014, FE1 spoke with the Whistleblower about the rumors and told him that he heard Whistleblower had "blown the whistle." *Id.* The Whistleblower responded that he had done so by calling L-3's New York headquarters. *Id.* Based on this conversation with the Whistleblower and the timing of Pruitt's termination, FE1 believes that the Whistleblower first reported "all of the negative and money-losing issues" regarding the C-12 Contract to L-3's headquarters in December 2013. *Id.* ¶ 76.[18] Later, in March or April 2014,

---

[15]    The basis of FE1's belief is not disclosed, nor is it clear whether FE1 is suggesting "a real problem" means something other than that the C-12 Contract was losing money.

[16]    As with other "rumors" alleged in the SCAC, there are no allegations regarding who passed on the rumor to FE1 or how the originator of the rumor would have known the underlying facts.

[17]    The SCAC allegation that the Whistleblower "blew the whistle" on "improprieties FE1 witnessed," SCAC ¶ 75, is odd inasmuch as the SCAC never alleges that FE1 witnessed any impropriety.

[18]    As discussed *infra*, Lead Plaintiffs rely heavily on the Whistleblower's purported call to L-3 headquarters. It should be noted that the SCAC does not allege that the Whistleblower called L-3's designated internal, confidential phone line ("Ethics Line"), nor does the SCAC allege what, either precisely or generally, the

according to FE1, the Whistleblower went to New York to meet with L-3's senior executives. *Id.* ¶ 77.[19]  Finally, according to FE1 and FE2, the following individuals were fired due to Whistleblower's reporting: Walsh, Wentlent, Pruitt, and the Logistics Solutions Sector general counsel, Steve Sinquefield.  *Id.* ¶ 78.[20]

Lead Plaintiffs also allege that, in accordance with a July 27, 2010 Administrative Agreement between the Air Force and L-3 to resolve L-3's suspension as a Government contractor ("Administrative Agreement"), Strianese, as CEO, would have had access to and a duty to review whistleblower calls made to L-3's Ethics Line.  *Id*. ¶¶ 32, 37.[21]

### C.  L-3's Disclosures

On July 31, 2014, L-3 issued a press release announcing its 2014 second quarter financial results with the caveat that the results were "preliminary because the Company is currently conducting an internal review that could result in increases to the preliminary adjustments included in this release." *Id.* ¶ 79.  The press release specified that the internal review related to "accounting matters at the Company's Aerospace Systems segment," and that "[t]he adjustments

---

Whistleblower said to whomever he spoke in L-3 headquarters.  Instead, the SCAC relies entirely on what FE1 *believes* the Whistleblower said and engages in unadulterated speculation to conclude that the supposed call occurred in December 2013.

[19]     The SCAC neither describes how FE1 knows this nor identifies with whom the Whistleblower was supposed to meet.  Perhaps the most glaring omissions are that the SCAC does not allege what was said during the Whistleblower's New York meeting or whether the meeting actually occurred.

[20]     The SCAC does not explain how FE1 knew that all of those employees were fired (as opposed to resigned) or the basis for FE1's conclusion that personnel action was taken because of something that the Whistleblower said, let alone what specifically the Whistleblower said to prompt the personnel action.

[21]     The SCAC alleges at some length various aspects of the L-3 Ethics and Business Conduct Program, SCAC ¶¶ 33-37, including that L-3 was required to have an Ethics Line to which employees could report concerns, *id.* ¶ 34. Strianese was affirmatively required to take necessary and appropriate actions to ensure that L-3 conducted its business in compliance with all applicable laws and to report to the Air Force quarterly the measures taken to ensure compliance with the Administrative Agreement. *Id.* ¶¶ 35-37.  The quarterly reports were required to include a summary of all calls made to L-3's Ethics Line.  *Id.* ¶ 37.  The Administrative Agreement lasted three years and thus would have expired by its terms on or about July 27, 2013, prior to any of the alleged reports by the Whistleblower. *See id.* ¶ 32.

primarily relate to contract cost overruns that were inappropriately deferred and overstatements

of net sales, in each case with respect to a fixed-price maintenance and logistics support

contract." *Id.*  The press release indicated that the financial adjustments would likely affect the

first half of 2014 and a period before 2014.  *Id.*

During a call with analysts and investors that day, Strianese stated that "the misconduct

included concealment from L-3's corporate staff and external auditors" and that L-3 has "taken

remedial actions including the termination of four employees," whom L-3 later identified as the

Aerospace Systems CFO (Walsh), the Logistics Solutions sector President,[22] and ASD's Vice

President (Pruitt) and President (Wentlent).  *Id.* ¶¶ 80, 89.[23]  On the same call, D'Ambrosio said

that L-3 would revise its previously issued financial statements for 2011 through the first quarter

of 2014.  *Id.* ¶ 81.  D'Ambrosio, however, also noted that the C-12 Contract "has been a low-

margin contract."  *Id.*  A JP Morgan analyst asked D'Ambrosio during the call if the negative

free cash flow in the first quarter of 2014, the first in fifteen years, was a red flag to L-3's

management; D'Ambrosio responded that it was not and that the C-12 Contract was "an

element" of the lower than normal cash flow but "a small portion of it."  *Id.* ¶ 82.[24]

---

[22]     The SCAC does not name this individual.

[23]     On March 4, 2016, during oral argument regarding Defendants' Motion, Mr. Curnin, counsel for
Defendants, stated that these employees were fired for intentional misconduct:

>     The Court: They also allege that L-3 admitted that the people who were fired engaged in
>     intentional wrongdoing.  Do you agree with that allegation, that L-3's statement constituted an
>     admission of intentional wrongdoing?

>     Mr. Curnin: L-3 acknowledged intentional misconduct below the corporate level, and it fired the
>     wrongdoers, so the short answer is yes, I do.

March 4, 2016 Oral Argument Transcript ("Tr.") 6:18-25 (Dkt. 58).  Mr. Curnin reiterated this admission later in
oral argument, stating, "And the company has disclosed that it fired these people and that it found instances of
intentional misconduct."  Tr. 13:1-3.

[24]     About three months earlier, during a May 1, 2014 investor conference call, an analyst had asked Strianese
and D'Ambrosio about the negative free cash flow in the first quarter of 2014 (free cash flow was negative $91
million, approximately $100 million lower than L-3 had anticipated), and they had responded that it was probably

The same day as the press release and the investor call, Reuters and the Wall Street Journal reported, respectively, that L-3's announcement was the result of an "employee complaint" and "whistleblower." *Id.* ¶ 83. L-3's stock price allegedly fell 12% from its closing price the prior day, reflecting an approximate $15 per share decrease and resulting in a loss of $1.25 billion in market capitalization. *Id.* ¶¶ 86, 118, 139.

In a September 26, 2014 press release, L-3 disclosed that the financial adjustments had an impact on both the Logistics Solutions and Platform Systems sectors of Aerospace Systems. *Id.* ¶ 87. L-3 also revealed that, after filing its Form 10-Q for the quarter ending March 28, 2014, it had identified material weaknesses in its internal controls over financial reporting that existed as of December 31, 2013 and March 28, 2014, and L-3 stated that it would amend its financial filings for those periods to correct the misstatements regarding the efficacy of its internal controls. *Id.* ¶ 88. Specifically, L-3 admitted material weaknesses to "procedures relating to the review of employee concerns regarding violations of the Company's accounting policies . . . ." *Id.* ¶ 89.

On October 3, 2014, L-3 announced its 2014 third quarter results and reported in an investor conference call that pre-tax charges for 2011 through second quarter 2014 went up to $169 million from the $84 million estimated on July 31, 2014, and that $69 million of the total pertained to the C-12 Contract. *Id.* ¶¶ 93, 94, 120. Lead Plaintiffs allege that L-3 acknowledged that it overstated its net income for 2013 by 5.2% and its pre-tax income for the first quarter of 2014 by 8.1%. *Id.* ¶ 131.

On October 10, 2014, L-3 issued another press release announcing the completion of its internal review and issued amended financial statements for the year ending December 31, 2013,

---

mostly related to the Aerospace Systems sector and due to "higher-than-expected collections last December," "some collections not happening," and "some advances slipping out of the first quarter." SCAC ¶ 109.

and for the first and second quarters of 2014.  *Id.* ¶ 91.  The second quarter 2014 Form 10-Q revealed that the Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ") were investigating L-3 regarding the accounting errors.  *Id.* ¶ 92.

Based on L-3's disclosures, Lead Plaintiffs contend that the following L-3 statements were materially false and misleading: the 2013 fourth quarter and annual financial results announced in a January 30, 2014 press release, *id.* ¶¶ 95-98; the 2013 annual financial statement filed on Form 10-K on February 25, 2014, *id.* ¶¶ 99-103; and the first quarter 2014 financial results filed on Form 10-Q on May 1, 2014 and the corresponding press release, *id.* ¶¶ 105-108.

### D.  Additional Scienter Allegations

Strianese exercised options and sold shares of L-3 stock in February and May of 2014, yielding approximately $11.3 million in profit.  *Id.* ¶ 158.  Lead Plaintiffs allege that these sales are suspicious and indicate a motive to make false and misleading statements because they purportedly occurred after the Whistleblower reported concerns to L-3 headquarters and because Strianese's stock sales in the prior six months yielded only $3.4 million.  *Id.* ¶ 159.

Lead Plaintiffs further allege that Defendants were motivated to make false and misleading statements to complete two debt offerings during the Class Period.  *Id.* ¶ 160.  On May 28, 2014, L-3 completed a debt offering of an aggregate $1 billion in senior notes.  *Id.*

### DISCUSSION

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks

omitted) (quoting *Twombly*, 550 U.S. at 555).  "[T]o survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters.*, Ltd., 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).

## I.     Lead Plaintiffs' Section 10(b) Claims Are Dismissed in Part

Section 10(b) and Rule 10b–5 make it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b–5(b).  To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege that "in connection with the purchase or sale of securities, the defendant made material misstatements or omissions of material fact, with scienter, and that the plaintiff's reliance on the defendant's actions caused injury to the plaintiff." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765 (2d Cir. 2010) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).

Because claims under Section 10(b) of the Securities Exchange Act sound in fraud, they are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the PSLRA.  Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted).  The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Under this heightened pleading standard, a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least

as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

The "required state of mind" for a Section 10(b) violation is an "intent to deceive, manipulate, or defraud," or recklessness. *Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (citations omitted). The Court must "take into account plausible opposing inferences" and consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24. The inference "must be more than merely 'reasonable' or 'plausible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 314. "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. "Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quotation marks and citation omitted).

## A. Lead Plaintiffs Fail to Plead Scienter as to the Individual Defendants

Defendants argue that Lead Plaintiffs fail to plead a strong inference of scienter as to the Individual Defendants because they do not allege facts showing that the Individual Defendants themselves had knowledge of or acted recklessly regarding the accounting errors and misconduct. Defs. Mem. 1-2 (Dkt. 39). Lead Plaintiffs contend that they have adequately pled scienter through the following allegations: (1) Individual Defendants ignored the Whistleblower's December 2013 complaint to L-3 headquarters, Pruitt's termination in January 2014, and the Whistleblower's meeting at L-3 headquarters in March or April of 2014, Pls. Opp. 23 (Dkt. 43); (2) Strianese had access to the Whistleblower call reports because of the Administrative Agreement, *id.* at 21, 24; and (3) both Strianese and D'Ambrosio had a duty to

14

monitor L-3's internal controls pursuant to the Sarbanes-Oxley Act ("SOX"), *id.* at 21-22.  Lead Plaintiffs assert that the following additional allegations regarding motive create a strong inference of scienter: (1) debt offerings made after the Whistleblower's headquarters visit and before L-3's first quarter 2014 report, *id.* at 26; and (2) Strianese's sale of personally held L-3 shares after the Whistleblower's December 2013 call to headquarters, resulting in $11.3 million in net proceeds, *id.* at 26-27.  The Court agrees with Defendants—the facts alleged by Lead Plaintiffs do not give rise to a plausible inference of fraudulent intent.

### 1.  Conscious Misbehavior or Recklessness

Lead Plaintiffs almost exclusively attempt to allege scienter through vague and speculative allegations that they assert add up to circumstantial evidence of conscious misbehavior or recklessness.  In the context of private securities fraud actions, recklessness means "conscious recklessness—*i.e.*, a state of mind approximating actual intent."  *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted) (quoting *Novak*, 216 F.3d at 312).  Examples of recklessness are "highly unreasonable" conduct that "represents an extreme departure from the standards of ordinary care," failure to review or check information where there is a duty to monitor, and ignoring obvious signs of fraud.  *Id.* (quotation marks and citations omitted).  It is "not merely a heightened form of negligence."  *Id*. (quotation marks omitted) (quoting *Novak*, 216 F.3d at 312).  "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'"  *Blanford*, 794 F.3d at 306 (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009)).

15

The adequacy of Lead Plaintiffs' scienter allegation hinges primarily on whether Lead Plaintiffs have pled facts that give rise to a strong inference that information regarding the accounting errors and misconduct had reached to the top of L-3—the managerial level of the Individual Defendants—by the time of the alleged misstatements.  To plead scienter through recklessness, Lead Plaintiffs must "specifically allege[] [Individual D]efendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, [the Individual D]efendants knew, or more importantly, should have known that they were misrepresenting material facts related to the Corporation." *Novak*, 216 F.3d at 308.  Key to the analysis is whether the "specific contradictory information was available to the [Individual D]efendants at the same time they made their misleading statements." *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (citation omitted).

The SCAC alleges three occasions on which the Individual Defendants learned of the accounting errors: a meeting between Strianese and the Whistleblower in Huntsville in the summer or fall of 2013, SCAC ¶ 73 & n.5;[25] a call from the Whistleblower to "L-3's corporate headquarters in New York" in December 2013, *id.* ¶ 75-76; and the Whistleblower's meeting with "the Company's senior executives" in New York in March or April 2014, *id.* ¶ 77; *see also* Pls. Opp. 2, 23.[26]  Largely because these putative interactions between the Whistleblower and unspecified personnel in L-3 headquarters are alleged based on second-hand information and FE1's speculation , Lead Plaintiffs do not allege with any particularity the who, what, and when

---

[25]    Lead Plaintiffs concede that, standing alone, FE1's guess as to the Whistleblower's meeting with Strianese in the summer or fall of 2013 does not establish scienter but argue that it contributes to the holistic scienter analysis. Pls. Opp. 18 n.10.  Given that Lead Plaintiffs continue to rely on this allegation as an indication of scienter, the Court addresses the strength of the allegation *infra*.

[26]    Lead Plaintiffs also contend, without explanation, that the Individual Defendants ignored "Pruitt's firing for intentional misconduct in January 2014" and that that fact contributes to an inference that the Individual Defendants acted with scienter.  Pls. Opp. 23.  For the same reasons discussed *infra* with respect to corporate scienter, Pruitt's termination does not create a strong inference of scienter as to the Individual Defendants.

of any of these events or any specificity as to what the Individual Defendants actually knew or should have known. *See In re Am. Express Co. Sec. Litig.*, No. 02 CIV. 5533 (WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (no scienter, in part, because plaintiffs failed to allege confidential sources had contact with individual defendants or otherwise knew what individual defendants knew or should have known), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010)*; see also Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) ("A plaintiff cannot satisfy a legal requirement merely by intoning vague descriptions bereft of any particulars."), *aff'd sub nom. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011).

Taking the allegations one by one: FE1 "believed it was possible" that Strianese met with the Whistleblower in Huntsville, but this belief was based solely on the fact that the Whistleblower wore a suit to work on one of the days of Strianese's visit, which was not the Whistleblower's usual practice. SCAC ¶ 73 n.5. The mere fact that the Whistleblower got dressed up on a day that overlapped with Strianese's visit to Huntsville does not support FE1's and Lead Plaintiff's leap of logic to the conclusion that the Whistleblower and Strianese actually met, let alone that during the meeting the Whistleblower alerted Strianese to an ongoing accounting fraud. Even if the Court were to accept Lead Plaintiffs' unsubstantiated leap of logic, other than Lead Plaintiffs' vague assertions that the supposed meeting took place in "late summer or fall of 2013" in "Huntsville" and FE1's speculation based on unspecified facts that "Strianese would not make a site visit unless there was a real problem," *id.* ¶ 73, Lead Plaintiffs fail to allege the time and place of the meeting, who was present, and, most importantly, what was actually discussed.

Similarly, Lead Plaintiffs maintain that "FE1 believes the Whistleblower first reported all of the negative and money-losing issues associated with the C-12 contract to L-3's corporate

office in New York in December 2013" via telephone.  *Id.* ¶ 76.  As to this purported circumstantial evidence of scienter, the SCAC does not actually allege that the Whistleblower reported anything to officials at corporate headquarters (the SCAC alleges only that FE1 *believes* that occurred).  Even if the Court were to accept an allegation of belief as being equivalent to a statement of fact as to the matter believed, reporting "negative and money-losing issues" associated with a contract is not the same as reporting an accounting fraud.  Contracts lose money all the time without there being any associated accounting chicanery.  Even if the Court were to ignore all of those problems with these allegations, the SCAC does not allege when the call occurred,[27] to whom the call was made, or what was actually said.

The final occasion on which the Individual Defendants were allegedly told about accounting fraud related to the C-12 contract fares no better.  The fact alleged in the SCAC is that Whistleblower went to New York in March or April 2014 to meet with "the Company's senior executives."  SCAC at ¶ 77.  The SCAC does not allege that a meeting actually occurred or, if it did, with whom the Whistleblower met or what the Whistleblower said.

In short, because FE1's statements regarding the three occasions on which the accounting fraud was supposedly communicated to the level of the Individual Defendants are vague and conclusory, these allegations do not amount to *facts* giving rise to a strong inference that the Individual Defendants themselves knew or should have known of the accounting errors that originated in the Army Support Section at the time the alleged misstatements were made.[28]

---

[27]      As indicated *supra* at note 18, FE1 is simply speculating that this call occurred in December 2013.

[28]      *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) (refusing to find scienter as to individual defendants because confidential witnesses did not "specifically detail what the Individual Exchange Act Defendants knew, when they learned it, or from whom"), *reconsideration denied,* No. 13-CV-6922 (AJN), 2015 WL 3540736 (S.D.N.Y. June 5, 2015); *Horowitz v. Green Mountain Coffee Roasters, Inc.*, No. 2:10-CV-227, 2013 WL 1149670, at *6-7 (D. Vt. Mar. 20, 2013) (plaintiffs failed to allege particularized facts demonstrating that individual senior-level defendants were alerted to or should have known information regarding the falsity of their statements); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onclusory statements [by

Primarily because Lead Plaintiffs never allege what the Whistleblower actually told personnel in

L-3's corporate headquarters, the Court finds that Lead Plaintiffs have failed to "particularize

how and why each defendant actually knew, or was reckless in not knowing, that the statements

were false at the time made."  *Silva Run Worldwide Ltd. v. Bear Stearns & Co.*, No. 96 CIV.

5102 (WK), 2000 WL 1672324, at *4 (S.D.N.Y. Nov. 6, 2000) (citation omitted).  Accordingly,

these ostensible interactions between the Whistleblower and L-3 corporate headquarters do not

give rise to a strong inference that the Individual Defendants acted consciously or recklessly in

ignoring information that was purportedly available to them.  *See Coronel v. Quanta Capital

Holdings Ltd.*, No. 07 CIV. 1405 (RPP), 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26, 2009)

(finding no scienter where complaint alleged no specific facts demonstrating defendants

possessed contradictory information at the time of the allegedly false statements).

      Lead Plaintiffs' additional allegations, namely that the Individual Defendants should have

known about the accounting errors because (1) Strianese had access to the Whistleblower call

reports and was obligated to monitor them and (2) the Individual Defendants had a duty under

SOX to monitor internal controls, do not create a strong inference of scienter.  Even if Individual

Defendants had a duty to review internal controls and Whistleblower call information,[29] because

of the lack of specificity regarding the transmission of information from lower-level employees

in Huntsville to L-3's headquarters, Lead Plaintiffs have failed to plead the facts that should have

---

confidential sources] that defendants 'were aware' of certain information, and mere allegations that defendants
'would have' or 'should have' had such knowledge is insufficient" to plead scienter.); *In re Federated Dep't Stores,
Inc., Sec. Litig.*, No. 00 CV 6362 (RCC), 2004 WL 444559, at *6 (S.D.N.Y. Mar. 11, 2004) (refusing to impute
knowledge to individual defendants without specific allegations that they themselves received the information that
allegedly established scienter, regardless of their position in the company).

[29]    As discussed *supra* at note 21, the Administrative Agreement on which Lead Plaintiffs rely to create an
affirmative duty to review whistleblower call information expired in July 2013; the expiration, therefore, precedes
the alleged communications from the Whistleblower on which Lead Plaintiffs rely to argue that the Individual
Defendants knew about the accounting problems.

been reviewed by the Individual Defendants that would have indicated to them that the financial

information being reported by ASD was false.  "Where plaintiffs contend defendants had access

to contrary facts, they must specifically identify the reports or statements containing this

information." *Novak*, 216 F.3d at 309.  Lead Plaintiffs do not specifically identify reports or

statements containing contrary facts or what the Whistleblower allegedly communicated to "L-3

headquarters" or how that information was contrary to information in L-3's financial statements.

*See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196

(2d Cir. 2008) (holding that plaintiffs did not raise an inference of scienter based on knowledge

of, access to, or a duty to review information because they did not specifically identify the

reports or statements containing the information); *In re Loral Space & Commc'ns Ltd. Sec.

Litig.*, No. 01 CIV. 4388 (JGK), 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) ("Because

the plaintiffs have not alleged with sufficient particularity the nature, the content, the reliability,

or the availability of the allegedly contradictory internal reports, the allegations concerning this

information do not provide sufficient circumstantial evidence to raise a strong inference of the

defendants' fraudulent intent.").

Moreover, "a Sarbanes-Oxley certification is probative of scienter only if the complaint

alleges specific contrary information, such as glaring accounting irregularities or other red flags,

of which the certifying defendant had reason to know." *In re Take-Two Interactive Sec. Litig.*,

551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008) (quotation marks and citation omitted).  Lead

Plaintiffs, as explained above, have not pled sufficient facts to demonstrate, even at the pleading

stage, that the Individual Defendants had reason to know of specific contrary information.  The

negative free cash flow in the first quarter of 2014, which Lead Plaintiffs allege was a red flag of

misconduct, SCAC ¶¶ 111(g), 188(g), is not adequately pled as a red flag because Lead Plaintiffs

fail to tie the negative free cash flow to the ultimately-discovered accounting problems.  The

analyst interview on which Lead Plaintiffs rely to plead the negative free cash flow as a red flag (which occurred in early May 2014) quotes D'Ambrosio as attributing the negative free cash flow in first quarter 2014 to higher than expected collections in December 2013, "some collections not happening", and "some advances slipping out of first quarter." *Id.* ¶ 109.  While the events that followed may have revealed that those explanations were not correct, they are not facially implausible, and there are no facts pled that could lead the Court to conclude that D'Ambrosio knew other facts at the time that undercut the explanation he provided.  Even after L-3's disclosure of accounting problems, D'Ambrosio's stated opinion was that the negative free cash flow "wasn't a red flag." *Id.* ¶ 82.  D'Ambrosio explained in an investor call that the C-12 Contract "was an element [of the negative free cash flow], but it was a small portion of it." *Id.* ¶ 82.  Lead Plaintiffs have pled no facts that give rise to an inference that L-3's discussion of the negative free cash flow was intentionally or recklessly false.

Failing to adequately allege any red flags or information contrary to the alleged public misstatements that reached the Individual Defendants, Lead Plaintiffs have failed to allege that Individual Defendants' conduct was "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak,* 216 F.3d at 308 (quotation marks and citations omitted). Lead Plaintiffs have not adequately alleged that the Individual Defendants were reckless because they have not pled facts that would support a conclusion that there was something "obvious" or "doubtful" that they "egregious[ly] refus[ed] to see . . . or to investigate." *Id.* (quotation marks and citation omitted); *cf. In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (holding that a failure to maintain sufficient internal controls by reducing the accounting staff by 75% was a red flag and constituted *strong* circumstantial evidence of recklessness).[30]

---

[30]     Lead Plaintiffs assert that significant GAAP violations, Pls. Opp. 24-25; SCAC ¶ 111(f), and the existence of SEC and DOJ investigations, Pls. Opp. 25; SCAC ¶ 111(e), add to the inference of scienter.  The alleged GAAP

### 2.   Motive and Opportunity

Lead Plaintiffs' alternative argument for scienter is based on motive—Strianese's stock sales and L-3's debt offering.  Pls. Opp. 26-27.  Motive, for the purpose of securities fraud, requires "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).  Motive shared by virtually all corporate insiders does not suffice; plaintiffs must "allege that defendants benefitted in some concrete and personal way from the purported fraud."  *Id.* at 307-08.  Without more, the desire to maintain high credit and bond ratings, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996), to maintain a high stock price to increase executive compensation, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995), or to preserve high credit ratings to maximize the marketability of a debt offering, *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 295 (S.D.N.Y. 2013), do not amount to a motive to commit securities fraud because they do not entail concrete, personal benefits—those  desires are common to all corporate officers.

Lead Plaintiffs argue that the combination of the overall scienter allegations and the temporal relationship between the Whistleblower's New York meeting in March or April 2014, the filing of L-3's first quarter Form 10-Q in May 2014, and L-3's public debt offering

---

violations do not create a strong inference of scienter as to the Individual Defendants because "without corresponding fraudulent intent," violations of GAAP are not proof of recklessness.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (citation omitted); *see also In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 188-89 (S.D.N.Y. 2012) (holding scienter was inadequately pled because there were no allegations that the individual defendants knew about the GAAP violations "or knowingly or recklessly disregarded applicable GAAP standards").  Similarly, while the Court may consider the existence of a Government investigation "as part of its analysis," an investigation "alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter."  *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013).  Given that the Court has determined that the other facts alleged by Lead Plaintiffs do not give rise to a strong inference of scienter as to the Individual Defendants, the alleged GAAP violations and Government investigations on their own do not create a strong inference of scienter.

announced less than two weeks later on May 28, 2014, suffice to indicate motive.  Pls. Opp. 26.

First, as discussed above at length, the SCAC does not actually allege that there was a meeting

between the Whistleblower and anyone in L-3 headquarters, and it does not allege what was said

during any meeting that might have occurred.  Putting all of that to one side, Lead Plaintiffs have

not alleged facts indicating that the debt-offering provided a personal, concrete benefit to the

Individual Defendants.  *See Novak*, 216 F.3d at 307-08.  Moreover, given that Lead Plaintiffs

have failed to plead other facts with sufficient particularity to support even a weak inference of

scienter, the debt offering cannot on its own provide motive.  Indeed, the cases cited by Lead

Plaintiffs finding motive allegations probative of scienter did so in combination with additional

supporting facts, the likes of which are absent here.  *See In re Genworth Fin. Inc. Sec. Litig.*, 103

F. Supp. 3d 759, 786 (E.D. Va. 2015) (finding scienter based on a totality of the circumstances

including a debt offering being made the day after the alleged material misstatement *and* multi-

million dollar bonuses paid on the basis of the misstatements *and* the magnitude of the revenue

overstatement); *Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, No. 5:13-CV-746

(MAD) (ATB), 2014 WL 4678046, at *14 (N.D.N.Y. Sept. 18, 2014) (finding corporate scienter

based on motive to issue indentures specifically in order to delay insolvency and thereby

continue receiving management fees).

  In order for insider stock sales to evidence a motive to commit securities fraud, the stock

sales must be "unusual" or "suspicious."  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp.

2d 261, 270 (S.D.N.Y. 2009) (citations omitted).

> Whether trading was unusual or suspicious turns on factors including (1) the amount of
> net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in
> volume of insider defendant's sales; (4) the number of insider defendants' selling; (5)
> whether sales occurred soon after statements defendants are alleged to know to be
> misleading; (6) whether sales occurred shortly before corrective disclosures or
> materialization of the alleged risk; and (7) whether sales were made pursuant to trading
> plans such as Rule 10b5–1 plans.

*Glaser*, 772 F. Supp. 2d at 587.  Between February and May 2014, Strianese exercised options to acquire and sell 218,000 shares of L-3 stock; his net proceeds were $11.3 million.  SCAC ¶ 158. Lead Plaintiffs contend that those sales are suspicious because: (1) they occurred near the time of the alleged misstatements and after the Whistleblower reported concerns to L-3 headquarters; and (2) in the prior six months, Strianese's net proceeds from stock sales equaled only $3.4 million.  Pls. Opp. 26-27 (citing SCAC ¶ 159).  As indicated above, the SCAC does not adequately allege that the Whistleblower reported anything to anyone in spring 2014, but even if it did, in February and May, Strianese sold approximately 218,000 shares, *see* Declaration of Michael J. Garvey in Support of Defendants' Motion to Dismiss the Second Consolidated Amended Complaint ("Garvey Decl.") Exs. O-Q (Dkts. 40-15, 40-16, 40-17),[31] which comprised only approximately 16% of the "total common stock beneficially owned" by Strianese, Garvey Decl. Ex. S, at 31 (Dkt. 40-19), meaning Strianese retained approximately 84% of his L-3 stock and stock options.  *See* Defs. Mem. 24.  That being so, Strianese's sales are hardly suspicious. *See, e.g.*, *In re Travelzoo Inc. Sec. Litig.*, No. 11 CIV. 5531(GBD), 2013 WL 1287342, at *10 (S.D.N.Y. Mar. 29, 2013) (finding insider sale not suspicious where insider retained 78% of total stockholdings); *In re Gildan Activewear*, 636 F. Supp. 2d at 271 & n.5 (finding insider sales not suspicious, in part, because they amounted to 22.5% or less of individual defendants' total holdings).

In contrast with *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1990), relied on by Lead Plaintiffs, where ten individual defendants sold between 17% and 100% of their

---

[31]  On a motion to dismiss, a court may consider "legally required public disclosure documents filed with the SEC."  *ATSI Commc'ns*, 493 F.3d at 98 (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).  Therefore, the Court considers L-3's Statements of Changes in Beneficial Ownership in L-3 filed with the SEC on Form 4, L-3's Notice of 2014 Annual Meeting and Proxy Statement, L'3's Form 8-K dated June 27, 2014, and L-3's Amended Form 10-K for the fiscal year ended December 31, 2013, dated October 10, 2014.

stock and where there were particularized allegations supporting contemporaneous knowledge of falsity, *id.* at 140, Lead Plaintiffs have not alleged that anyone other than Strianese made allegedly suspicious stock sales in the relevant time period—nor have they alleged other facts supporting scienter.  *See Acito*, 47 F.3d at 54 ("[T]he existence, *without more*, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." (emphasis added)).

### 3.  Compelling and Opposing Inferences

To determine whether an inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," *Tellabs*, 551 U.S. at 324, the Court must assess "all the allegations holistically" and ask, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *id.* at 326.  The inference argued for by Defendants is that the Individual Defendants did not know and did not have reason to know that they were misstating L-3's financials in January through May 2014 because contrary information was not elevated beyond the relevant division during that time.  The inference proposed by Lead Plaintiffs is that both Strianese and D'Ambrosio knew or had reason to know that L-3s financial statements were misstated because contrary information reached L-3 headquarters during the relevant time.

Making a holistic examination of the allegations in the SCAC, the Court is not persuaded that the inference of scienter is as compelling as the opposing inference of the non-fraudulent intent of the Individual Defendants.  Principally because Lead Plaintiffs have not plead with particularity *what* the Whistleblower told to *whom* in L-3 headquarters and *when*, the additional facts relied on by Lead Plaintiffs to support an inference of scienter, including the debt offering, Strianese's stock sales, the Government investigations, the GAAP violations, and the duty to monitor internal controls, do not combine with the vague and speculative Whistleblower

allegations to give rise to any inference of scienter—let alone an inference of scienter that is as strong as the opposing non-fraudulent inference. *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 547 n.21 (S.D.N.Y.) (explaining that, according to *Teamsters Local*, 531 F.3d at 197, the Second Circuit's strong inference of scienter analysis is "interrelated" with *Tellabs'* competing inference scienter), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

In sum, Lead Plaintiffs have failed to plead facts with particularity supporting a strong inference of scienter as to the Individual Defendants under a theory of motive or recklessness, and accordingly, Lead Plaintiffs' claim against the Individual Defendants for violations of Section 10(b) of the Securities Exchange Act and Rule 10b–5 is dismissed.

### B.  Lead Plaintiffs Plead a Strong Inference of Scienter as to L-3

For a corporate defendant, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters*, 531 F.3d at 195.  The simplest way to generate a strong inference of corporate scienter is to do so for an individual defendant. *Id.*  In this case, Lead Plaintiffs have failed to plead facts giving rise to a strong inference of scienter as to the Individual Defendants.  Thus, the question becomes whether L-3's scienter can be derived from some other employee's scienter.  "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y.) (citing *In re Marsh & McLennan*, 501 F. Supp. 2d at 481), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009).

Lead Plaintiffs allege that the following facts establish a strong inference of L-3's scienter: (1) FE1's statements about the Whistleblower's reports to L-3 headquarters, buttressed

by the timing of Pruitt's termination; and (2) L-3's "admission" that four managers within the Aerospace Systems segment engaged in intentional misconduct.  SCAC ¶ 181-83; *see also* Pls. Opp. 18-19, 20.  Lead Plaintiffs also argue that the Whistleblower's alleged reports to L-3 headquarters in December 2013 and in March or April 2014 and Pruitt's termination allegedly in January 2014 were red flags disregarded by L-3 that should have put it on notice of the fraud. Pls. Opp. 20.  Defendants contend that these facts are not sufficiently particularized to raise a strong inference of scienter as to L-3.  Defs. Mem. 12-13.  The Court finds that the same lack of particularity that plagued Lead Plaintiffs' scienter allegations as to the Individual Defendants precludes a strong inference of scienter as to L-3 with respect to all but one of Lead Plaintiffs' arguments.  Given the facts alleged in the SCAC and given Defendants' admission during oral argument that Walsh, CFO of the Aerospace Systems segment, among others, was terminated for intentional wrongdoing, Walsh's scienter can be imputed to L-3.  To emphasize, however, the fragility of Lead Plaintiffs' case against L-3, the Court addresses not only the basis for imputing scienter to L-3 but also Lead Plaintiffs' unpersuasive arguments, which constituted the bulk of Lead Plaintiffs' briefing.[32]

Starting with Lead Plaintiffs' unpersuasive arguments, as previously discussed, FE1's speculation and belief that the Whistleblower reported something to L-3 headquarters provides neither the contents of the reports nor to whom or when they were made.  In their opposition to Defendants' Motion, Lead Plaintiffs re-characterize the facts actually alleged in their SCAC in an attempt to add particularity where it is lacking.  For example, in their brief, Lead Plaintiffs

---

[32]    Because the parties' briefs barely addressed whether scienter could be imputed to L-3 from the four employees terminated by L-3 during the fall out from the discovery of the accounting fraud, on March 4, 2016, the Court ordered the parties to submit supplemental letter briefs addressing that issue (Dkt. 55).

The Court cites to Defendants' March 10, 2016 supplemental letter brief (Dkt. 56) as "Defs. Letter" and to Lead Plaintiffs' March 10, 2016 supplemental letter brief (Dkt. 57) as "Pls. Letter."

characterize the SCAC as having alleged that "the Whistleblower was brought to L-3's corporate office in New York in March or April 2014," Pls. Opp. 18, when the SCAC actually alleges that "FE1 stated that the Whistleblower flew to New York in March or April 2014 to meet with the Company's senior executives," SCAC ¶ 77, without specifying how FE1 knew this, what the specific purpose of the meeting was, who initiated the meeting, with which L-3 executive the Whistleblower met, and whether the meeting actually occurred.  Similarly, Lead Plaintiffs assert in their brief that "the Whistleblower reported the fraud directly to L-3's corporate office," Pls. Opp. 18, but the SCAC does not specify what the Whistleblower actually reported other than "all of the negative and money-losing issues associated with the C-12 [C]ontract," SCAC ¶ 76, and "the improprieties FE1 witnessed," *id.* ¶ 75.  *See In re SAIC, Inc. Sec. Litig.*, No. 12 CIV. 1353 (DAB), 2013 WL 5462289, at *9 (S.D.N.Y. Sept. 30, 2013) (no scienter because information allegedly indicating scienter "does not indicate what was within the Company's line of vision at the time" of the alleged misstatements), *on reconsideration*, No. 12 CIV. 1353 (DAB), 2014 WL 407050 (S.D.N.Y. Jan. 30, 2014).  Not only do Lead Plaintiffs not allege what the Whistleblower told the unidentified people in L-3 headquarters, but merely reporting that the C-12 Contract was losing money does not produce a strong inference of scienter absent a lot of other facts that are not alleged.

Lead Plaintiffs also argue that senior management had access to information contradicting L-3's public statements because Strianese and L-3's Ethics Officer had access to Whistleblower reports pursuant to the Administrative Agreement with the Air Force.  Pls. Opp. 19.  This argument is unavailing because the Lead Plaintiffs have not alleged that the Whistleblower actually made a whistleblower report to the L-3 Ethics Line that the CEO was

supposed to monitor.[33]  Even if there were such an allegation in the SCAC, without specifying

the contents of the alleged reports, Lead Plaintiffs have failed adequately to allege the

information to which senior management had access that served as red flags.  *See Hart v.*

*Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001) ("[E]ven an egregious failure

to gather information will not establish 10b–5 liability as long as the defendants did not

deliberately shut their eyes to the facts." (quotation marks and citation omitted)).

Furthermore, Lead Plaintiffs fail to allege with the requisite particularity that L-3's senior

management's alleged knowledge dates back to a time prior to the issuance of L-3's 2013 annual

results.  Lead Plaintiffs merely state that "FE1 believes" the Whistleblower first "blew the

whistle" in December 2013 without alleging any basis for that belief.  *See* SCAC ¶¶ 75-76.  Even

accepting as true Lead Plaintiffs' factual allegation that, according to FE1, Pruitt was demoted

and fired in January 2014,[34] FE1 does not state why Pruitt was demoted and terminated at that

point, except that "after Pruitt left, it was obvious that something was going on."  SCAC ¶ 74.

Even accepting the vagueness of an allegation based on what a low level employee believed was

"obvious," many things other than an accounting fraud could have been going on that would

have warranted the demotion and discharge of Pruitt (to name just two: poor performance or

misconduct unrelated to accounting).  In any event, Lead Plaintiffs have also failed to present

any facts suggesting that L-3's headquarters knew of or were involved in the decision to demote

---

[33]     Although it is obviously a good corporate governance practice for the CEO of a company to be briefed
regularly on calls to the company's Ethics Line, as discussed *supra* at notes 21 and 29, because the Administrative
Agreement with the Air Force expired in July 2013, it is not at all clear that Strianese had a continuing *duty* to
review regularly those calls.

[34]     The parties dispute the actual date of Pruitt's termination—January or July 2014.  Defs. Mem. 17; Pls. Opp.
14-15.  In support of their position that Pruitt was terminated in July, Defendants encourage the Court to consider
certain facts and a document not contained in the pleadings, namely Pruitt's formal termination letter.  Garvey Decl,
Ex. U (Dkt. 40-21).  The Court declines to consider this information in resolving the Motion to Dismiss.  *See S.E.C.
v. Simonson*, No. 96 CIV. 9695, 2000 WL 781084, at *1 (S.D.N.Y. June 19, 2000).

or terminate Pruitt—who was at least three levels removed from headquarters—in December 2013, despite Lead Plaintiffs' claim that "it is not speculative at all given Strianese's agreement to stay informed about whistleblower complaints," Pls. Opp. 15.  Without additional facts connecting Pruitt's termination in January to the fraud as of December 2013, Pruitt's termination does not corroborate FE1's belief that the Whistleblower "blew the whistle" on an accounting fraud in December 2013, nor does it sustain a strong inference of corporate scienter prior to the issuance of L-3's 2013 annual financial statements.

Setting aside these failed arguments, the allegation that L-3 terminated four managers within the Aerospace Systems segment—including Walsh, the CFO of the Aerospace Systems segment—for intentional misconduct, gives rise to a strong inference of corporate scienter.  The SCAC incorporates multiple public statements by L-3 in the aftermath of the accounting misstatements disclosure that, taken together, signal that L-3 believed that the four managers were terminated by L-3 because they engaged in intentional wrongdoing vis-à-vis the accounting misstatements.  Specifically, in its initial press release on the matter issued on July 31, 2014, L-3 stated that it "believes the amounts associated with these adjustments are the result of misconduct and accounting errors at the Aerospace Systems segment."  SCAC ¶ 79.  That same day, Strianese told investors and analysts that L-3 "became aware of misconduct" and has "taken remedial actions including the termination of four employees."  *Id.* ¶ 80.  Likewise, during that call, D'Ambrosio referred to the cause of the accounting errors as "misconduct."  *Id.* ¶ 81.  Strianese also sought to ease investors' and analysts' concerns during the call by informing them that "the people have been fired.  They are gone.  So that gives me a lot of confidence that that was the failure point because we have some bad actors and they are no longer part of L-3."  *Id.* ¶ 171.  In its September 26, 2014 press release, L-3 disclosed that "*intentional* override of numerous transactional and monitoring internal controls" contributed to the accounting

misstatements and that L-3 was replacing four members of "senior management." *Id.* ¶ 89

(emphasis added).  L-3 again acknowledged in its Amended 10-K that the accounting

misstatements were attributable to "intentional" control overrides.  *Id.* ¶ 122.

Moreover, during oral argument, Defense counsel stated explicitly that L-3 fired the four

L-3 managers for intentional misconduct.  Tr. 6:18-24, 13:1-3.[35]  Although Defendants are

correct that these managers were all "below the corporate level," Tr. 6:23, "there is no simple

formula for how senior an employee must be in order to serve as a proxy for corporate scienter,"

*In re Marsh & McLennan*, 501 F. Supp. 2d at 481; *see also In re Moody's Corp. Sec. Litig.*, 599

F. Supp. 2d at 515-16 ("There is no formulaic method or seniority prerequisite for employee

scienter to be imputed to the corporation . . . .").  Walsh, as the CFO of one of L-3's four

business segments, was situated one management level down from the CEO and CFO of L-3 and

was responsible for a business segment comprising 36% percent of L-3's total business, SCAC ¶

31, qualifying him as "sufficiently senior" to serve as a proxy for L-3's scienter.[36]

Because Lead Plaintiffs have adequately pled that Walsh is someone whose scienter can

be imputed to L-3 and that Walsh engaged in intentional misconduct with respect to the

---

[35]     See note 23 *supra* for the exact quotation.

[36]     *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015)
(imputing corporate scienter from knowledge of a managing director); *In re Sanofi Sec. Litig.*, No. 14-CV-9624
(PKC), 2016 WL 93866, at *14 (S.D.N.Y. Jan. 6, 2016) (explaining that, although plaintiffs failed to allege strong
circumstantial evidence of deliberate illegal behavior, an Assistant Vice President and Vice President of two of the
company's various business units were management-level employees for the purpose of imputing corporate
scienter), *judgment entered*, No. 14-CV-9624 (PKC), 2016 WL 145867 (S.D.N.Y. Jan. 7, 2016); *Pa. Pub. Sch.
Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (imputing knowledge to the
corporate defendant from a vice president and assistant vice president); *Richman v. Goldman Sachs Grp., Inc.*, 868
F. Supp. 2d 261, 281 n.10 (S.D.N.Y. 2012) (imputing knowledge from company's Mortgage Department Head to
corporate defendant); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (imputing
knowledge of Vice Chairman, Vice President, and Managing Director to corporate defendant); *In re BISYS Sec.
Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (imputing scienter to the corporate defendant from the regional
vice president and vice president of corporate finance).

accounting misstatements, Lead Plaintiffs have succeeded in alleging L-3's scienter.[37]  Based on

Lead Plaintiffs' allegations and Defendants' admissions, at the motion to dismiss stage the

inference of scienter as to L-3 is "cogent and at least as compelling as any opposing inference

one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also City of Pontiac Gen.*

*Employees' Ret. Sys.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss

stage, a tie on scienter goes to the plaintiff.").[38]  Although Lead Plaintiffs have pled a strong

inference of corporate scienter for the purpose of surviving Defendants' Motion to Dismiss, to

survive summary judgment or to win at trial, Lead Plaintiffs will need to *prove* that Walsh acted

with the requisite scienter *at the time of each of the alleged misstatements* in order for L-3 to be

held liable for the alleged Section 10(b) violation.

---

[37]     Defendants argue, relying primarily on *Teamsters Local*, 531 F.3d at 195, that the state of mind of the four terminated employees cannot be imputed to L-3 because the SCAC does not allege that these individuals were responsible for making or approving L-3's public disclosures. Defs. Letter 2-3, 4.  In discussing whether there was scienter, the Second Circuit in *Teamsters Local* does state in *dicta* that plaintiffs "would have [the court] infer that someone whose scienter is imputable to the corporate defendants and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements." 531 F.3d at 197.  Nevertheless, the person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at issue. *See Pa. Pub. Sch. Employees' Ret. Sys.*, 874 F. Supp. 2d at 372-73 (collecting cases); *see also In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d at 516 ("[T]he individual making an alleged misstatement and the one with scienter do not have to be one and the same."); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d at 481 ("Confining the pool of employees from which a corporation's scienter may be inferred to those that made an underlying misstatement . . . is unduly limiting.  This framework forecloses liability in situations where institutional fraud is readily perceivable but plaintiffs have yet to match a culpable employee with a public misstatement. . . . Imposing this limitation at the pleading stage would doom the long-recognized concept of primary entity liability to irrelevancy, effectively limiting the liability of corporate defendants to secondary liability under Section 20(a)."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 627 ("[N]othing in Rule 9(b) or the PSLRA requires a plaintiff to allege that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter.").  Moreover, even if Walsh did not "make" the alleged misstatements, he likely was in part "responsible" for them, in the words of *Teamsters Local*, because, as the CFO of one of four primary business segments, he would have been responsible for reporting the financial results of his segment, which fed into L-3's financial statements, thereby causing the misstatements in L-3's financial disclosures.

[38]     Defendants argue that because L-3 self-reported the accounting fraud and because the responsible individuals allegedly hid the fraud from L-3's headquarters, the fired individuals' scienter should not be imputed to L-3.  Defs. Letter 3-4, 5 n.2; Defs. Mem. 18.  The law should, as a policy matter, encourage companies to self-report wrongdoing, and L-3 rightly did so in this case.  L-3 no doubt hoped to receive benefits for self-reporting from the SEC and the DOJ and in its business relationship with the Department of Defense, in accordance with those agencies' rules and policies on self-reporting.  That L-3 self-reported, however, is not a factor in determining whether there is an individual whose scienter can be imputed to L-3.  Companies may receive credit for self-reporting elsewhere but not in this aspect of the corporate scienter analysis.

### C.  Lead Plaintiffs Adequately Plead Materiality

To prevail on their Section 10(b) claim, Lead Plaintiffs must also plead that Defendants made a statement that was "'misleading as to a material fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  "[T]his materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Id.* (quotation marks omitted) (quoting *Basic*, 485 U.S. at 231-32).  Materiality is a mixed question of law and fact.  *ECA, Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 197.  Thus, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Id.* (ellipsis in original) (quotation marks and citations omitted).

Defendants argue that the misstatements in L-3's financial statements were immaterial because the charges to L-3's operating income were insignificant compared with L-3's total operating income.  Defs. Mem. 28-29.  Specifically, Defendants contend that $54 million in charges to operating income over the relevant three-and-a-quarter year period, during which L-3 reported $4.3 billion in operating income, was only 1.25% of L-3's total operating income for that period and is thus immaterial as a matter of law.  *Id.* at 29; Defs. Reply 14; *see* Garvey Decl. Ex. F, at 1, Table E (Dkt. 40-6) (Form 8-K with July 31, 2014 press release, breaking down pre-tax charges by period and listing operating income for first quarter 2014), Ex. A, at 33 (Dkt. 40-1) (Amended Form 10-K, listing operating income for 2011-2013).  Lead Plaintiffs, however, reconfigure the numbers to break down the impact of the charges by quarter, year, and business segment.  Analyzing the impact of the charges in this way, L-3's net income for 2013 was

overstated by 5.2%, L-3's pre-tax income for the first quarter of 2014 was overstated by 8.1%,

Aerospace Systems' 2013 operating income was overstated by 14.2%, and Aerospace Systems'

operating income for the first quarter of 2014 was overstated by 21.3%.   Pls. Opp. 32, 33 (citing

SCAC ¶¶ 131, 136).

There is no bright line numerical rule by which to judge materiality.  *Ganino*, 228 F.3d at

162.  Nonetheless, to guide materiality determinations, "the Second Circuit considers the SEC's

bulletin on materiality 'persuasive authority.'"  *City of Pontiac Gen. Employees' Ret. Sys.*, 875 F.

Supp. 2d at 368 (citing *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 197-

98).  "The SEC bulletin interpreting 'materiality' under Rule 10b–5, suggests that there exists a

preliminary assumption, or 'rule of thumb,' that changes of less than 5% to financial statements

are immaterial, although there are various 'qualitative factors' that could make even a small

change material."  *Id.* (citing SEC, Staff Accounting Bulletin No. 99 ("SAB 99"), 64 Fed. Reg.

45150-01, 45142 (Aug. 12, 1999)).  The SEC bulletin sets forth qualitative factors to consider in

evaluating materiality.  *See* SAB 99, at 45,152.

L-3's alleged misstatements in its 2011 through 2014 financial reports are not so

obviously unimportant that reasonable investors would not disagree as to their significance.  The

change to L-3's stated operating income is less than 5% only when averaged over the three-and-

a-quarter year period.  Courts in this Circuit, however, assess the materiality of alleged financial

misstatements not only on an annual basis for the company as a whole but also on a quarterly

basis and by business segment.  *See Ganino*, 228 F.3d at 165-66 (citing cases regarding quarterly

statements); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 411 (S.D.N.Y.1998)

(analyzing the impact of the financial misstatements compared to the corporate parent's total

earnings and to the subsidiary's earnings).  Moreover, changes to financial results can be

material even if they amount to less than a 5% change.  *See, e.g.*, *City of Pontiac Gen.*

*Employees' Ret. Sys.*, 875 F. Supp. 2d at 368 (declining to hold as a matter of law that

misstatements affecting profits by 2.7% were immaterial); *In re Kidder Peabody Sec. Litig.*, 10

F. Supp. 2d at 410 (declining to hold as a matter of law that misstatements affecting profits by no

more than 2.54% were immaterial).  The following qualitative factors suggest that the

misstatements were material: Aerospace Systems, comprising 36% of L-3's total business, is an

important segment of L-3's business, SCAC ¶ 31; the misstatements affected L-3's compliance

with regulatory requirements; and L-3's share price declined 12% after disclosure, *id.* at ¶¶ 86,

118, 139.  *See* SAB 99, at 45,152; *Litwin v. Blackstone Grp.*, 634 F.3d 706, 720 (2d Cir. 2011)

(concluding that a misstatement may be material as to "a particularly important segment" of

company's business, even if small relative to company as a whole); *City of Pontiac Gen.*

*Employees' Ret. Sys.*, 875 F. Supp. 2d at 368-69 (finding qualitative factors such as a 10% stock

price drop and the importance of the business to the company indicative of materiality).

 Because Lead Plaintiffs have adequately pled L-3's scienter and materiality, Defendants'

Motion to Dismiss Lead Plaintiffs' claim against L-3 for violations of Section 10(b) of the

Securities Exchange Act and Rule 10b–5 is denied.[39]

## II. Lead Plaintiffs' Section 20(A) Claim Is Dismissed

 Lead Plaintiffs have alleged Strianese and D'Ambrosio violated Section 20(a) of the

Exchange Act.  "To establish a prima facie case of control person liability, a plaintiff must show:

---

[39] Defendants also argue that Lead Plaintiffs plead falsity by hindsight.  Defs. Mem. 26-27.  Defendants argue this in the context of whether Lead Plaintiffs have alleged any actionable misstatements or omissions, but the issue of falsity by hindsight is really a question of scienter.  Whether Lead Plaintiffs have pled falsity by hindsight depends on what L-3 knew at the time of each statement.  *See In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 306 (S.D.N.Y. 2014).  Where the alleged misstatements are statements of current fact (as opposed to forward-looking statements), such as in this case, plaintiffs must plead knowing falsity or recklessness.  *Id.* (quoting *Slayton*, 604 F.3d at 772).  Because Walsh's intentional wrongdoing can be imputed to L-3, Lead Plaintiffs have pled adequately knowing falsity by L-3.  But, to survive summary judgment or succeed at trial, Lead Plaintiffs will have to prove that Walsh knew or was reckless in not knowing that each of the alleged misstatements were false when made.

(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108 (citation omitted).  Thus, "[a]ny claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pac. Inv. Mgmt. Co.*, 603 F.3d 144, 161 (2d Cir. 2010) (citing 15 U.S.C. § 78t(a)).

Lead Plaintiffs have adequately alleged the first two elements of a Section 20(a) violation but not the last.  Because Walsh's intentional misconduct can be imputed to L-3, Lead Plaintiffs have adequately alleged that L-3 committed a primary violation of Section 10(b) of the Exchange Act; Lead Plaintiffs have also adequately alleged that the Individual Defendants, as CEO and CFO of L-3 and signatories to L-3's financial disclosures, had control of L-3.  *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586 (VEC), 2014 WL 6466994, at *14 (S.D.N.Y. Nov. 18, 2014) ("Plaintiff's allegations that the Individual Defendants held positions as senior executives or board members who exercised control over, and in most cases were signatories to, the public SEC filings on which Plaintiff relied in investing . . . are sufficient to establish control of the primary violator." (citation omitted)).  "[T]here is a split among district courts in this Circuit as to whether 'culpable participation' is an element that must be pled with the same particularity as scienter."  *Id.* (citing *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 13 CIV. 1094 (ER), 2014 WL 3605540, at *24–25 (S.D.N.Y. July 21, 2014)); *see also In re ShengdaTech, Inc. Sec. Litig.*, No. 11 CIV. 1918 (LGS), 2014 WL 3928606, at *10 & n.1 (S.D.N.Y. Aug. 12, 2014) (collecting cases).  For the reasons articulated in *Special Situations Fund III QP, L.P.*, 2014 WL 3605540, at *24-25, this Court finds more persuasive the line of cases holding that "culpable participation" is an element of a Section 20(a) claim that must be pleaded with the same particularity as scienter.  Lead Plaintiffs have failed to

allege that Individual Defendants were in any meaningful sense culpable participants in the fraud.  For all the reasons discussed *supra*, the allegations from FE1 and FE2, Pruitt's termination, Strianese's stock sales, L-3's debt offering, and Strianese's access to the Ethics Line reports fail to show in any way that the Individual Defendants knew, were reckless in not knowing, or were in any way connected to the accounting fraud taking place in Aerospace Systems with respect to the C-12 Contract.  Accordingly, Lead Plaintiffs' Section 20(a) claim against the Individual Defendants is dismissed.

**III.    Lead Plaintiffs' Motion to Strike Is Denied As Moot**

Subsequent to Defendants' Motion to Dismiss, Lead Plaintiffs moved to strike Exhibit U to Defendants' Garvey Declaration in support of Defendants' Motion to Dismiss on the basis that it is extrinsic evidence neither cited nor relied upon in the SCAC and thus was improperly introduced on the Motion to Dismiss.  Pls. Mem. Strike 1, 5 (Dkt. 46).  Exhibit U is an April 24, 2015 letter from Mr. Garvey, counsel to Defendants, to Lead Plaintiffs' counsel.  Garvey Decl. Ex. U.  Exhibit A to that letter purports to be Pruitt's termination paperwork.  Because the Court did not consider Exhibit U in deciding Defendants' Motion to Dismiss, Lead Plaintiffs' Motion to Strike is denied as moot.

**CONCLUSION**

The SCAC fails adequately to allege scienter necessary to state claims against the Individual Defendants pursuant to Sections 10(b) and 20(a) of the Exchange Act.  Lead Plaintiffs do, however, adequately allege scienter and materiality necessary to state a claim against L-3 pursuant to Section 10(b) of the Exchange Act.  Accordingly, Defendants' Motion to Dismiss is

GRANTED as to all claims against the Individual Defendants without leave to replead and DENIED as to L-3.[40]  Lead Plaintiffs' Motion to Strike is DENIED as moot.

The parties must appear for a pretrial conference on April 15, 2016, at 10:00 a.m. in Courtroom 443 of the Thurgood Marshall United States Courthouse to set a discovery schedule. No later than April 7, 2016, the parties must file a joint letter and case management plan in accordance with the Court's August 6, 2014 Order (Dkt. 4).

The Clerk of the Court is respectfully directed to terminate the Individual Defendants from these cases and the pending motions at docket entries 38 and 45.

**SO ORDERED.**

**Date:  March 30, 2016**                                                  **VALERIE CAPRONI**
      **New York, New York**                              **United States District Judge**

---

[40]      The claims against the individuals are dismissed without leave to replead because Lead Plaintiffs acknowledged during oral argument that they have included in the SCAC all the facts they have relative to the Individual Defendants.  Tr. 24:12-13. 26:7-16.  That being the case, leave to replead would be futile.